Heidi Sargent JELDNESS, Jenny Costa, Helen Jodi Bedell, Gretchen M. Schumacher, Plaintiffs, Appellants, and Cross–Appellees,

v.

Fred B. PEARCE, et al., Defendants, Appellees, and Cross–Appellants.

Nos. 91–36271, 93–36350.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 4, 1993.

Decided July 28, 1994.

Martha C. Evans, Susan R. Pease, Evans Harrison Pease, Springfield, OR, for plaintiffs-appellants-cross-appellees.

Rives Kistler, Asst. Atty. Gen., Salem, OR, for defendants-appellees-cross-appellants.

Before: PREGERSON and KLEINFELD, Circuit Judges; LEGGE *, District Judge.

Opinion by Judge LEGGE; Dissent by Judge KLEINFELD.

LEGGE, District Judge:

A class of women prisoners incarcerated in Oregon state prison allege that the Oregon State Department of Corrections discriminates against women inmates in providing educational and vocational opportunities, in violation of Title IX and its regulations, 20 U.S.C. § 1681 *et seq.*, 45 C.F.R. §§ 86.1 *et seq.*, and the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution.

Following trial, the district court ruled against plaintiffs on all but one of their claims. Plaintiffs appeal, claiming that the district court erred in holding that: (1) Title IX requires only "parity" rather than "equality" in prison educational programs; (2) Title IX violations are subject to the defense of "penological necessity"; and (3) gender discrimination in prisons does not violate the Equal Protection Clause when it is "reasonably related to a legitimate penological goal." Plaintiffs ask that the case be remanded to the district court for further factual findings using the correct legal standards.

Defendants cross-appeal from the district court's holding that plaintiffs were not required to prove "discriminatory intent" in order to establish a violation of the Title IX regulations. Defendants also appeal from the district court's award of attorneys' fees to plaintiffs.

The appeals present difficult issues of the application of Title IX, which prohibits gender discrimination in education, to state prison systems. We have jurisdiction under 28 U.S.C. § 1291. Statutory interpretation is a question of law reviewed *de novo.* *Anderson v. United States,* 966 F.2d 487, 489 (9th Cir.1992). We affirm in part, reverse in part, and remand for further proceedings.

I.

Women prisoners incarcerated in the Oregon Women's Correctional Center (OWCC) initiated this class action ten years ago. They allege discrimination in six educational and vocational training programs in the Oregon penal system: prison industries, a forest camp, a farm annex, apprenticeships, vocational programs, and college courses. The class seeks declaratory and injunctive relief.

The Oregon state prison facilities include (1) the Oregon State Penitentiary (OSP), a maximum security facility for men with approximately 1800 inmates; (2) the Oregon State Correctional Institution (OSCI), a medium security facility for men with approximately 1000 inmates; (3) OWCC, a medium security facility for women with approximately 200 inmates; (4) the Eastern Oregon Corrections Institute (EOCI), a medium security facility for men with approximately 1200 inmates; (5) a Farm Annex where 225 male inmates live and work; and (6) a Forest Work Camp for approximately 110 male inmates.

The Oregon penal system provides educational and vocational programs for its inmates. But men and women have access to different programs. For example, there are two vocational classes offered at OWCC, while there are twelve each at OSP and

---

* The Honorable Charles A. Legge, United States District Judge for the Northern District of Cali-    fornia, sitting by designation.

OSCI. Women may attend vocational classes with men at OSCI, but they must be searched in order to travel between prisons and often arrive late for classes.[1] There are no apprenticeship programs at OWCC. Women may participate in certain apprenticeship programs at OSCI, but may not participate in the mechanical trade apprenticeship programs. Male inmates may request transfers to different institutions to participate in different programs, but these transfer requests are generally denied because of prison overcrowding.

## II.

After a non-jury trial in 1986, the district court found in favor of plaintiffs on one issue and in favor of defendants on all other issues. The plaintiff class appealed, arguing that certain procedural errors prejudiced the trial. We reversed and remanded on procedural grounds. *Jeldness v. Watson,* 857 F.2d 1478 (9th Cir.1988). But that decision did not resolve any of the substantive issues.

On remand, defendants moved for summary judgment. In its well-considered order on the motion, the district court ruled on the applicable legal standards governing plaintiffs' claims under both Title IX and the Equal Protection Clause. The court held (1) that gender based classifications which were "reasonably related to legitimate penological interests" did not violate the Equal Protection Clause; (2) in a prison context, Title IX requires gender "parity" rather than "equality" or "identity" of treatment; (3) a showing of discriminatory intent is not necessary for plaintiffs to prevail under the regulations to Title IX; and, (4) "penological necessity" is a complete defense to gender based disparate impact under Title IX. · The district court entered partial summary judgment for defendants.

Following a non-jury trial using those legal standards, the court made extensive findings of fact and entered judgment for defendants on all but one of plaintiffs' claims. The court ruled that defendants had violated Title IX regulations by paying men, but not women, for vocational training. Judgment was entered for plaintiffs on that claim, and the court also awarded attorneys' fees to plaintiffs. The court made the following rulings as to each of the six programs:

*Prison Industries*

The district court found on summary judgment that any differences in the availability of particular jobs or work programs were related to custody status, not to gender. The court also found after trial that any disparities in pay were related to market forces rather than gender.

*Forest Camp*

The court granted summary judgment for defendants, relying on the penological necessity defense. The court found that women are excluded from the forest camp because mixed gender crews could cause safety problems in this wilderness setting, where inmates restore forests and fight fires with minimal supervision. The court also held that defendants had not violated the Equal Protection Clause, because of the substantial governmental interest in excluding women from the camp. And it held that defendants did not violate Title IX, because of the "substantial legitimate penological necessity of separately housing prisoners by sex."

*Farm Annex*

The court granted summary judgment for defendants, relying on the penological necessity defense. In its summary judgment order, the court found that women could *work* at the annex; and that any disparity in the availability of programs or jobs there was attributable to the fact that women could not *reside* there, which was "justified by the substantial legitimate penological necessity of separately housing inmates on the basis of sex." At trial, the court stated that the women's level of participation depended primarily on factors other than gender, but that "any distinction in job assignments at the farm annex relate to supervision and security concerns and are the result of a legitimate penological necessity."

*Apprenticeships*

The court entered judgment for defendants following trial, based on the penological

---

1. "Skin searches" are required of all prisoners, male and female, when moving between prisons.

necessity defense. Although women are permitted to participate in some apprenticeship programs at the men's prison, no woman has ever applied to do so. However, the court found that prior to 1990 women were not informed of the apprenticeship opportunities.[2] Women can participate in five vocational trade apprenticeships at OSCI, but cannot participate in the four mechanical trade apprenticeships at OSCI (welding, painting, cabinet making, plumbing) because of security or supervision problems. The court concluded that defendants excluded women from the mechanical trade apprenticeships because of legitimate penological necessity.

*Vocational Programs*

Following trial, the court entered judgment for defendants on the availability of vocational programs, finding that the programs were "equal in substance and form," although not exactly the same. The court found that "any discrepancies in equal availability" were the result of "legitimate penological necessity."

OWCC offers two vocational courses, cosmetology and office administration. Women may take an additional 12 classes at OSCI. The court found that this allocation of courses did not "reflect gender based stereotypes" but was based on the size of the prisons. The court found that because women often arrived late at OSCI, it took some women longer than men to complete the courses. Women are also subject to skin searches when exiting and entering OSCI for their classes. The court held that these disparities are justified by the defense of legitimate penological necessity.

The court entered judgment for plaintiffs on their Title IX claim that men, but not women, were awarded merit pay for vocational work. The court found that the prison policy of awarding merit pay did not constitute intentional discrimination, and therefore did not violate the Equal Protection Clause. However, the court found that the regulations to Title IX do not require proof of

discriminatory intent to establish liability, and therefore entered judgment against defendants on that claim.

*College Courses*

At trial the court found as a fact that college level educational opportunities for women are "equal to or greater than" educational opportunities for men. Although there are fewer lower division courses offered to women than to men, the court found that women do not take longer to get a degree, and that the ratio of classes per inmates is greater at OWCC. The court also found that women have equal access to admission to upper division courses.

## III.

■ Do the requirements of Title IX apply to educational programs in state prisons?

Title IX provides, in relevant part, that "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance ..." 20 U.S.C. § 1681(a). The Oregon penal system receives federal financial assistance.

Whether Title IX applies to state prisons receiving federal funding is a question of first impression in this circuit. The problem of applying a statute which generally forbids gender based distinctions to prisons are significant, given this country's long-standing history of sex-segregated prisons. *See Dothard v. Rawlinson,* 433 U.S. 321, 326, 97 S.Ct. 2720, 2725, 53 L.Ed.2d 786 (1977). And plaintiffs here do not challenge the general policy of maintaining single-sex prisons. However, neither party has cited, nor could this court find, any case holding that the broad language of Title IX is not applicable to prisons. And two district courts have specifically allowed Title IX suits against state prisons. *Canterino v. Wilson,* 546 F.Supp. 174 (W.D.Ken.1982), *vacated on other grounds,* 869 F.2d 948 (6th Cir.1989);

---

**2.** Failure to participate in apprenticeship programs does not preclude women from legal standing to protest their exclusion if they were not informed of the opportunity to so participate.

*See e.g., Reed v. Arlington Hotel Co.,* 476 F.2d 721, 724 (8th Cir.1973) (holding that failure to notify minorities of opportunities for transfers and promotions constituted discrimination).

*Beehler v. Jeffes,* 664 F.Supp. 931 (M.D.Pa. 1986).

■ Starting with the language of the statute itself, Title IX on its face applies to "any education program or activity receiving Federal financial assistance," with certain statutory exceptions. The statute exempts religious schools, military and merchant marine schools, fraternities, sororities, voluntary youth organizations, and beauty pageants, among others. 20 U.S.C. § 1681(a)(3)–(9). There is no exemption for correctional institutions. When a statute lists specific exemptions, other exemptions are not to be judicially implied. *Andrus v. Glover Constr. Co.,* 446 U.S. 608, 616–17, 100 S.Ct. 1905, 1910–11, 64 L.Ed.2d 548 (1980). Title IX was amended twice since the two above-cited district courts applied Title IX to prisons. But Congress did not add an exemption for prisons. *See Canterino,* 546 F.Supp. 174; *Beehler,* 664 F.Supp. 931; Civil Rights Remedies Equalization Amendment of 1986, 46 U.S.C. 2000d–7; Civil Rights Restoration Act of 1987, P.L. 100–259.

Prisons are specifically, if briefly, mentioned in the legislative history of Title IX. The Senate Report for the Civil Rights Restoration Act of 1987, which clarified that Title IX and several other civil rights statutes applied to an entire institution receiving federal funds, and not just to the specific program or activity receiving the money, stated "Prolonged debate takes place over what constitutes a 'program or activity' under the civil rights law, while the universities, schools and *correctional facilities* receive millions of federal dollars." (emphasis added) S.Rep. No. 100–64, 100th Cong., 2d Sess. 11 (1987), *reprinted in* 1988 U.S.Code & Admin. News 3, 13.[3]

Thus, we agree with the district court below, and with the court in *Canterino,* which stated:

This Court cannot judicially impose a special exception to these statutes for correctional institutions. Congress was certainly aware that these non-discrimination clauses could result in administrative problems in many areas. As a result, exceptions were made in other areas to the application of the nondiscrimination language of Title IX of the 1972 Education Amendments. See 20 U.S.C. § 1681(a)(1)–(9). If there is a compelling need to exempt corrections from these requirements regarding education and employment programs, that argument should be addressed to the legislative branch.

*Canterino,* 546 F.Supp. at 210.

The statute, the case law, and the legislative history all suggest that Title IX should apply to prisons; there is no contrary authority. Thus, although the application of Title IX's requirements must be analyzed in the context of the prison environment, state prisons which receive federal financial assistance are bound by the mandates of Title IX. The application of those mandates is discussed below.

Defendants argue for the first time on appeal that Title IX does not apply to the

---

**3.** In 1971, Senator Bayh introduced legislation which was the predecessor to Title IX, but which was not passed. When debating that predecessor bill, Senator Bayh stated:

As one member of this body who has been and *is greatly concerned about the equality of opportunity for women,* I would not want this argument to devolve into disputes of whether this would require equal restrooms or equal incarceration in penitentiaries. It seems to me such disputes are merely strawmen to take our attention away from the real inequities that do in fact exist.

117 Cong.Rec. 30403 (1971). This comment implies that Senator Bayh did not intend the predecessor bill to apply to penitentiaries. However, neither Senator Bayh nor any of the other congressman made any comments regarding the application of Title IX to penal institutions during the debates about the final version of the amendments which became Title IX.

Senator Bayh introduced the amendment in 1972. Title IX is more extensive than the predecessor bill which Senator Bayh discussed in the quote above. The predecessor legislation would only have guaranteed equal educational opportunity in "program[s] and activit[ies] conducted by a public institution of higher education, or any school or department of graduate education *which is a recipient of federal financial assistance."* 117 Cong.Record 30399, sec. 601. 118 Cong.Record 4964. The Senate bill, which was accepted by the conference committee, prohibits discrimination on the basis of gender "under any education program or activity receiving Federal financial assistance" with certain enumerated exceptions. 20 U.S.C. § 1681.

farm annex, the forest work camp, or the prison industries because they are not "educational" programs within the meaning of Title IX. This is a factual issue. Since the case is being remanded to the district court, this argument can be considered by that court.

## IV.

■ Defendants argue that the regulations of the Department of Health and Human Services under Title IX do not apply to prisons, because the regulations were not written with prisons in mind. 45 C.F.R. §§ 86.1 *et seq.* Defendants contend that the regulations assume co-educational facilities and freedom of movement, and that the regulations were written for "kindergarten through high school" and not for prisons.

However, it is clear that the regulations are not meant to apply only to traditional educational institutions. The stated purpose of the regulations "is to effectuate Title IX ... which is designed to eliminate (with certain exceptions) discrimination on the basis of sex in any education program or activity receiving Federal financial assistance, *whether or not such program or activity is offered or sponsored by an educational institution* ..." 45 C.F.R. § 86.1 (emphasis added).

Title 45 C.F.R. § 86.11 provides that the regulations apply "to every recipient and to each education program or activity operated by such recipient which receives or benefits from Federal financial assistance." A recipient is defined as:

> any State or political subdivision thereof, or any instrumentality of a State or political subdivision thereof, any public or private agency, institution, or organization, or other entity, or any person, to whom Federal financial assistance is extended directly or through another recipient and which operates an education program or activity which receives or benefits from such assistance, including any subunit, successor, assignee, or transferee thereof. 45 C.F.R. § 86.2(h).

There is no dispute that the Oregon penal system does receive federal funds.

Certain institutions are specifically exempted from coverage by the regulations: religious schools, military and merchant marine educational institutions, sororities and fraternities, YMCA, YWCA, Girl Scouts, Boy Scouts, Camp Fire Girls, and other voluntary youth service organizations. 45 C.F.R. §§ 86.12–86.14. There is no exemption for correctional institutions.

The court concurs with the district court that state prisons receiving federal funds must comply with the regulations applicable to Title IX, 45 C.F.R. §§ 86.1 *et seq.* But the application of those regulations must be consistent with the basic needs of prisons and the *bona fide* reasons for segregation of the genders in prisons.

## V.

■ Plaintiffs claim that the district court erred in requiring only "parity," rather than "equality," of treatment under Title IX in the context of prison educational programs. Defendants contend that Title IX requires only the level of protection offered by the Equal Protection Clause, and that "parity" is therefore sufficient to satisfy Title IX.

We again focus on the language of the statute. Title IX provides that "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance ..." 20 U.S.C. § 1681. The statute's language clearly states that women may not be excluded from participation in educational programs, may not be denied the benefits of educational programs, and may not be subjected to discrimination in the covered educational programs. This language suggests that the standard is "equality" rather than "parity."

One case discussing Title IX's applicability to prisons held that women were entitled to more protection under Title IX than under the Equal Protection Clause. That court said that Title IX required the state to "offer equivalent programs in *form* as well as in substance." *Canterino,* 546 F.Supp. at 210. The court stated that not all programs need

to be co-correctional, but that "a consistent good faith effort must be made to include female inmates in the benefits of all programs ..." *Id.* In contrast, the court said that under the Equal Protection Clause, opportunities available to women must be substantially equivalent in substance, if not in form, to those available to men, and that the constitution only required "parity." *Id., citing Glover v. Johnson,* 478 F.Supp. 1075, 1079 (E.D.Mich.1979) (applying intermediate scrutiny standard of *Craig v. Boren,* 429 U.S. 190, 197, 97 S.Ct. 451, 456, 50 L.Ed.2d 397 (1976), to Equal Protection challenge of sex discrimination in prisons).

Defendants base their argument that Title IX is coextensive with the Equal Protection Clause by interpreting Title IX with cases analyzing Title VI, 42 U.S.C. § 2000d. They contend that Title VI is coextensive with the constitution, and does not mandate more than what is required under the Equal Protection Clause. *See, e.g., Regents of the University of California v. Bakke,* 438 U.S. 265, 340, 98 S.Ct. 2733, 2773, 57 L.Ed.2d 750 (1978) (Brennan, J., concurring in part and dissenting in part) ("Congress intended the meaning of [Title VI's] prohibition to evolve with the interpretation of the commands of the Constitution"). Title VI uses almost the same language as Title IX, providing that, "No person in the United States shall, on the ground of race, color or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

Defendants are correct that Title IX is sometimes analyzed according to principles defined in Title VI cases. However, those decisions have been largely procedural rather than substantive. *See, e.g., Cannon v. University of Chicago,* 441 U.S. 677, 684–89, 99 S.Ct. 1946, 1951–53, 60 L.Ed.2d 560 (1979) (analyzing whether a private right of action exists under Title IX and Title VI); *Grove City College v. Bell,* 465 U.S. 555, 566, 104 S.Ct. 1211, 1218, 79 L.Ed.2d 516 (1984) (analyzing whether student aid funds constitute federal financial assistance sufficient to trigger Title IX and Title VI); *Franklin v. Gwinnett County Public Schools,* — U.S. —, —–—; 112 S.Ct. 1028, 1036–37, 117 L.Ed.2d 208 (1992) (analyzing whether damages remedy is available in a private action brought to enforce Title VI and IX). And the decisions finding Title VI to be coextensive with the Equal Protection Clause were based largely on the legislative history of Title VI (passed in 1964), which is not necessarily analogous to the legislative history of Title IX (passed in 1972). *See, e.g., Bakke,* 438 U.S. at 338, 98 S.Ct. at 2772; *Guardians Assn. v. Civil Service Comm'n,* 463 U.S. 582, 589–91, 103 S.Ct. 3221, 3225–27, 77 L.Ed.2d 866 (1983).

Under the Equal Protection Clause gender and race are treated differently; race is accorded strict scrutiny whereas gender is only accorded intermediate scrutiny.[4] By contrast, the language of both Title VI and Title IX is the same: "No person in the United States shall, on the basis of sex [race for Title VI], be excluded from participation in, be denied the benefits of, or be subjected to discrimination ..."

Because Title IX and Title VI use the same language, they should, as a matter of statutory interpretation, be read to require the same levels of protection and equality. They should not be read to require different levels of protection because the Equal Protection Clause is interpreted differently for

---

4. Statutes that discriminate on the basis of gender are upheld only if the government can show that the classification "serve[s] important governmental objectives" and that the discriminatory means employed are "substantially related to the achievement of those objectives." *See e.g., Mississippi Univ. for Women v. Hogan,* 458 U.S. 718, 724, 102 S.Ct. 3331, 3336, 73 L.Ed.2d 1090 (1982); *Wengler v. Druggists Mutual Ins. Co.,* 446 U.S. 142, 150, 100 S.Ct. 1540, 1545, 64 L.Ed.2d 107 (1980); *Craig v. Boren,* 429 U.S. at 197, 97 S.Ct. at 456.

Statutes that discriminate on the basis of racial or ethnic classification are upheld only if the government can show a "compelling governmental interest" and that the means chosen to effectuate its purpose are "narrowly tailored to the achievement of that goal", *Wygant v. Jackson Bd. of Ed.,* 476 U.S. 267, 274, 106 S.Ct. 1842, 1847, 90 L.Ed.2d 260 (1986); *Palmore v. Sidoti,* 466 U.S. 429, 432–33, 104 S.Ct. 1879, 1881–82, 80 L.Ed.2d 421 (1984).

race than for gender. Research has disclosed no opinion holding that Title IX is coextensive with the Equal Protection Clause. In the absence of such authority, it is not proper to depart from the plain language of the statute. Thus, like the court in *Canterino*, we hold that prison educational programs subject to Title IX must be "equally" available to male and female inmates. We therefore REVERSE the district court's ruling that only "parity" rather than "equality" is required in prison education programs subject to Title IX.

But what does "equality" mean in a prison setting?

## VI.

Prisons are different from other institutions to which Title IX applies. Security is an important concern. And sex segregation is the accepted norm. In Oregon there are far more male than female prisoners; each of three men's prisons holds more inmates than does the single women's prison. It is thus important to consider what Title IX and its regulations require of such state prison educational programs.

Does equality mean that women must have access to exactly the same programs offered to men, either within the women's prison or by transporting the women to the men's prisons? If women are transported to men's prisons, does the imposition of additional burdens, such as tardiness and "skin searches," violate Title IX? May the fact that men's prisons are larger and contain more inmates be taken into account when deciding how many and what classes to offer?

The regulations under Title IX are the first step in defining the applicable standards. They state generally that "no person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any academic, extracurricular, research, occupational training, or other education program or activity operated by a recipient ..." 45 C.F.R. § 86.31(a). Specifically, recipients are prohibited from (1) treating the genders differently in determining eligibility for programs; (2) providing "different aid, benefits, or services or provid[ing] aid, benefits, or services in a different manner"; (3) denying anyone "aid, benefits or services"; (4) subjecting anyone "to separate or different rules of behavior, sanctions or other treatment." 45 C.F.R. § 86.31(b). Strictly construing the regulations would suggest that women should have identical access to the same classes, vocational programs, and apprenticeships as men.

However, the regulations do not deal with the fact that prisons have special security concerns that other educational institutions do not, and that the genders are segregated for security reasons. Nor do the regulations consider that: women's prisons are usually smaller than each of the men's prisons; there may not be the same demands for the same courses; and some programs are site-specific, such as those near a local community college which may offer different programs.

Some regulations under Title IX pertain to programs which may be offered separately on the basis of sex. For example, the regulations provide that institutions may administer scholarships provided by foreign institutions or wills that are restricted by sex, as long as they make "available reasonable opportunities for similar studies for members of the other sex." 45 C.F.R. § 86.31(c). And educational institutions are not required to have exactly equal athletic teams, or to spend the same amount of money on teams for both sexes, but they are required to provide "equal opportunities." 45 C.F.R. § 86.41(c).

We think that it is clear that Title IX and its regulations do not require gender-integrated classes in prisons. Institutions may have separate toilet, shower and locker room facilities. And institutions may "provide separate housing on the basis of sex." 45 C.F.R. § 86.32(c). That section defines the standards for the separate housing:

(2) Housing provided by a recipient to students of one sex, when compared to that provided to students of the other sex, shall be as a whole:

(i) Proportionate in quantity to the number of students of that sex applying for such housing; and

(ii) Comparable in quality and cost to the student.

The district court will face the difficult task of determining how those requirements, as well as the permissible extent of the security concerns, are to be applied to Oregon's farm annex and forest work crews.

■ If an education program takes place in the prison, exclusion of women from a particular class solely because women do not reside at the prison offering that class is not improperly segregating "separately on .the basis of sex," but ·it is rather an activity "separately on the basis of location." The prohibited activity would be the offering of educational programs only in the men's prisons, without offering equivalent programs in the women's prison. In that case, women would be "denied the benefits of a program" on account of sex.

■ Strict one-for-one identity of classes may not be required by the regulations. But there must be reasonable opportunities for similar studies at the women's prison and women must have an equal opportunity to participate in educational programs. For example, the apprenticeship programs offered to men and women could perhaps differ depending on interest and need, but totally denying women access to half the apprenticeship opportunities men have would seem to violate the regulations. In this case, women were denied access to all of the mechanical trade apprenticeships. And facilities such as labs, classrooms, and workshops must be comparable to each other.

■ It may not be necessary to offer as many classes in a small women's prison as in the larger men's prisons. But the number of classes offered should at least be proportionate, not just to the total number of inmates, but to the number of inmates desiring to take educational programs. And the inmates must be made aware of the opportunity for participation in various programs before their interests can be assessed. In order to give women "equal opportunity," there may need to be a higher number of courses offered so that women have comparable variety in course selection.

Neither this appellate court, nor perhaps even a state or federal district court, can define the precise type and number of educational and work programs to be offered to the genders in prisons. The role of the judicial branch is not to take over those important and difficult functions of the executive branch. Rather, the judicial branch can only define the boundaries of what is required of the executive branch by Congress and by the constitution. It is clear to this court that state prisons receiving federal funds are required by Title IX to make reasonable efforts to offer the same educational opportunities to women as to men. Although the programs need not be identical in number or content, women must have reasonable opportunities for similar studies and must have an equal opportunity to participate in programs of comparable quality. These are the standards which the district court must attempt to apply on the remand of the issue of equality under Title IX. We do not minimize the difficulties of applying these standards or the problems discussed by the dissent.

## VII.

■ Plaintiffs also challenge the district court's holding that "in the context of a prison, a correctional division policy which results in a gender based disparate impact ... can be justified by a 'penological necessity' " under Title IX. The district court held that this affirmative defense of penological necessity justified many of the disparities in Oregon's prison educational programs. The court's definition of "penological necessity" was not limited to security concerns, but also included the goals of "efficient and cost effective rehabilitation."

The district court quite logically interpreted the penological necessity defense by analogy to the "business necessity defense" under Title VII disparate impact cases, and the "educational necessity defense" under Title VI and Title IX disparate impact cases. Under those titles, once plaintiffs have shown that a facially neutral practice has a disparate impact, the defendant may still prevail by proving a business or educational necessity for the practice. *See, e.g., Griggs v. Duke*

*Power Co.,* 401 U.S. 424, 432, 91 S.Ct. 849, 854, 28 L.Ed.2d 158 (1971) (Title VII); *Larry P. by Lucille P. v. Riles,* 793 F.2d 969, 982 (9th Cir.1984) (no educational justification under Title VI for administering I.Q. tests which disproportionately place minorities in classes for retarded children); *Sharif by Salahuddin v. New York State Ed. Dept.,* 709 F.Supp. 345, 360–364 (S.D.N.Y.1989) (no educational justification under Title IX for awarding merit scholarships based solely on SAT scores, which disproportionately affects girls adversely).

However, this court concludes that penological necessity is not a *defense* to Title IX. Rather, it is just one concern to be considered in *how* the equality principles of Title IX are to be applied in prisons. Our holding that Title IX does not require co-educational classes in prisons satisfies most of the legitimate security concerns. And we disagree with the district court that efficiency and cost effectiveness are valid *security* concerns. They are cost and management concerns which must be applied consistently with the requirements of Title IX. We agree with the *Canterino* court that the requirements of Title IX can be carried out "without compromising any valid correctional concerns over security, order, and discipline." *Canterino,* 546 F.Supp. at 210. As we have discussed, Title IX and its regulations contain numerous exceptions, but do not exempt prisons.

In the context of prison employment, the United States Supreme Court considered the business necessity defense to a charge that height and weight requirements had a disparate impact on women who wished to be prison guards, and the Court found that such requirements improperly excluded women without a valid business necessity. *Dothard v. Rawlinson,* 433 U.S. 321, 328–32, 97 S.Ct. 2720, 2726–28, 53 L.Ed.2d 786 (1977). It did not apply a more deferential standard than the normal Title VII analysis merely because the employer was a prison. *Id.*

In interpreting Title VII, the Supreme Court also made it clear that the business necessity defense is not available in disparate treatment cases, but only in disparate impact cases. In disparate treatment cases employers must pass the more stringent test of *bona fide* occupational qualification which is mandated by statute. *See International Union v. Johnson Controls, Inc.,* 499 U.S. 187, 199, 111 S.Ct. 1196, 1204, 113 L.Ed.2d 158 (1991); 42 U.S.C. § 2000(2)–2(e)(1). Title IX contains no explicit statutory exemption such as that test. We need not resolve here whether the proper analysis for all of the educational programs in this case is disparate treatment or disparate impact. We need only restate our conclusion that penological necessity is not a *defense* in a Title IX case, but only a factor in *how* Title IX is applied in prisons.

The district court's application of penological necessity to plaintiffs' Title IX claims must therefore be REMANDED for reconsideration under these standards.

## VIII.

◼ Defendants appeal the district court's decision on vocational training pay, which also formed the basis for an award of attorneys' fees to plaintiffs. Judgment was entered in favor of plaintiffs on their claim that paying men, but not women, for vocational training violated Title IX. Defendants contend that the district court erred in holding that that disparate effect created liability under the regulations to Title IX without the necessity of showing an intent by defendants to discriminate.

At trial, the district court found that two of the men's prisons (OSP and OSCI) offer 12 vocational courses each; the women's prison (OWCC) offers only 2 courses. However, women were free to participate in all vocational programs at OSCI. Men at OSCI were eligible for "merit pay" for their participation in vocational programs, but women in the *same vocational programs at OSCI* were not paid.[5] The court ruled that "plaintiffs did not prove intent to discriminate on the basis of gender," apparently because the decision not to pay women was not made with a malevolent motive but because OWCC and OSP had a historical policy of not paying

5. Men at OSP were not paid for vocational training. Historically, OWCC was associated with

OSP. And the policy at OSP and OWCC was that inmates are not paid for education.

inmates for education. The court therefore held that paying men but not women violated Title IX, where no intent was required, but not the Equal Protection Clause.

The court assumed that not paying women for participating in vocational classes at OSCI, while paying men performing the same jobs in the same place, was a discriminatory *effect* rather than disparate *treatment* of men and women. However, the absence of discriminatory *motive* does not transform a policy which discriminates on its face into a neutral policy with only a discriminatory effect. *Johnson Controls,* 499 U.S. at 198–201, 111 S.Ct. at 1203–04. Under defendants' system, men at OSCI received merit pay for vocational training, whereas *no* women taking the same training at OSCI received pay. Men and women worked side by side in the same programs, but only the men and not the women were paid for their work. This constitutes disparate treatment, not merely disparate impact. There is thus no need to decide whether disparate impact claims under Title IX's regulations require proof of discriminatory intent.

We AFFIRM the district court's ruling. The award of merit pay to men, but not to women, participating in the same vocational training course in the same location constitutes disparate treatment, not disparate impact. Such disparate treatment is clearly forbidden by Title IX and its regulations. 45 C.F.R. §§ 86.31, 86.51. Because we affirm that finding, we also affirm the district court's award of attorneys' fees to plaintiffs.

### IX.

One claim of plaintiffs' on appeal has not been discussed. Plaintiffs argue that the district court's ruling on their Equal Protection claim was error. The district court held that under the Equal Protection Clause discriminatory policies could be upheld if they were "reasonably related to legitimate penological interests." *See Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987). Plaintiffs argue that in this case the proper standard of review is whether the discriminatory classification is substantially related to an important governmental interest. *See, e.g., Mississippi Univ. for Women*

*v. Hogan,* 458 U.S. 718, 724, 102 S.Ct. 3331, 3336, 73 L.Ed.2d 1090 (1982); *Pitts v. Thornburgh,* 866 F.2d 1450, 1454 (D.C.Cir.1989) (*Turner* reasonableness standard not applicable to prison policy decisions that do not implicate prison security and day-to-day management concerns).

Because our decisions above with respect to the application of Title IX will resolve the issues in this case, it is unnecessary to reach this constitutional question. *See Hagans v. Lavine,* 415 U.S. 528, 547, 94 S.Ct. 1372, 1384, 39 L.Ed.2d 577 (1974) ("a federal court should not decide federal constitutional questions where a dispositive nonconstitutional ground is available.").

### X.

The dissent suggests that we should affirm the district court because appellants have not challenged specific findings of fact made by that court. However, when a district court's findings are based upon an incorrect legal standard, the appropriate remedy is to remand so that findings can be made in accordance with the applicable legal standard. *See Pullman–Standard v. Swint,* 456 U.S. 273, 287, 291–92, 102 S.Ct. 1781, 1789, 1791–92, 72 L.Ed.2d 66 (1982); *Fragante v. City and County of Honolulu,* 888 F.2d 591, 594 (9th Cir.1989).

For the reasons stated above, the judgment of the district court is REVERSED in part, AFFIRMED in part, and REMANDED for further proceedings using the standards defined in this opinion. On remand, the district court's application of these standards may result in some of the same ultimate conclusions as it has already reached in its extensive Pretrial Order, Order on Motion for Summary Judgment, and Findings of Fact and Conclusions of Law. However, because the standards used by the district court were in some respects different from those that we now define, reconsideration on remand is necessary.

KLEINFELD, Circuit Judge, dissenting:

The majority creates a new body of prison law. I fear that it will generate continuing prison supervision by district judges, instead

of by prison administrators, in an attempt to assure compliance with a standard lacking any objective meaning.

Title IX does, as the majority says, apply to educational programs in institutions receiving federal money. The statute has no prison exception. The district court correctly held that paying male and female prisoners differently for the same training discriminated by sex in violation of Title IX. So far, we agree.

We diverge on what Title IX means. The briefs lead the majority astray. Neither side asks us to decide this particular case. They both want us to construe the statute generally. Plaintiffs want us to say that "no discrimination" means "equality." Defendants want "parity." The district court, after trial, made careful and precise findings of fact. Not a single finding is challenged on appeal. The appellants challenged only the legal principles applied to the facts by the district court. But the appellants do not show how "equality" rather than "parity" would change the outcome of this particular case, given the unchallenged fact findings. Nor do I see how the fact findings could be different in this particular case because of the legal principles adopted by the majority.

The parties invite us to legislate in the air, without relating the rules at issue to the case at bar. The majority accepts the invitation. I think we should limit ourselves to deciding this particular case, and summarily affirm because (1) appellants have not claimed that any of the findings of fact are clearly erroneous, and (2) have not argued that, given those findings, any of the legal principles they urge would require a different result. Because the majority has gone further, and construed the statute independently of the effect of the construction on the case, I write separately to explain my different opinion of what the statute means.

Title IX prohibits discrimination by sex. It does not speak of "equality" or "parity." Nor does it speak of equivalence, proportionality, or penological necessity. The majority says (1) "no discrimination" means "equality"; (2) "prison educational programs subject to Title IX must be 'equally' available to male and female inmates"; (3) equal availability means "reasonable opportunities for similar studies at the women's prison"; (4) "there may need to be a higher number of courses offered so that women have comparable variety in course selection"; (5) the number of classes for women must "at least be proportionate, not just to the total number of inmates, but to the number of inmates desiring to take educational programs"; and (6) "penological necessity" is "not a *defense*," but "just one concern to be considered in *how* the equality principles of Title IX are to be applied in prisons." All this has some appeal as a matter of policy. But the statute does not say these things. Nor have plaintiffs demonstrated that Oregon has not done these things. The findings of fact suggest that Oregon has done what the majority says it should do, and the plaintiffs have offered no argument in their briefs that it has not.

If we were free to turn a statute saying "no discrimination" into one saying "equality," then we would at least be obligated to give "equality" a usable meaning. We have not. A usable meaning would be one which the Administrator of the Oregon Department of Corrections could himself apply, so that state prison educational program administration would not have to be turned over to the United States District Courts in Oregon for the exercise of discretion. Law ought to be capable of voluntary compliance. Usable law, law which controls judges as well as administrators, cannot be so vague and subjective as to require continuing supervision under a permanent injunction. When we formulate a rule which is not usable law in this sense, we take power away from democratically responsive government and shift it to federal judges.

If "equality" is the standard, as the majority says, then the only usable meanings I can think of for "equality" are expenditure per prisoner, or course availability per prisoner. About 5% of Oregon's prisoners are female, yet 25% of the courses offered are in the women's prison. The discrepancy in course availability exceeds this ratio, because women have access to programs in mens' institutions but men do not have access to programs in the women's prison. The findings of fact provide the numbers for this chart:

| | number of courses | number of inmates | inmates per course | courses per inmate |
|---|---|---|---|---|
| OWCC (women) | —18 | 213 | 12 | .084 |
| OSCI (men) | —34 | 1100 | 32 | .031 |
| OSP (men) | —30 | 2093 | 70 | .014 |
| EOCI (men) | — 8 | 1300 | 163 | .0062 |

The women's prison has almost 2½ times as many courses per prisoner as the most generous male prison, OSCI, and over 13 times as many as EOCI, the least generous. The women's prison has 2¼ as many courses as EOCI, even though it has only ⅙ as many prisoners. If, as the majority evidently concludes, a serious question can be raised whether with these numbers the female prisoners are denied "equality" in educational programs, then the term "equality" has no objective or usable meaning. The necessary consequence of "equality" as the construction of the statute, if the word means anything like what it means in ordinary English, is that the Oregon female prisoners have suffered no adverse discrimination. The males have.

Why should we construe the statutory prohibition of sex discrimination to require "equality" of availability to equivalent programs, with the "equality" to be proportionate to prisoners' "desires," considering "penological necessity," as the majority says? The statute does not say that. This rule is too subjective for prison administrators to be able to apply it reliably enough to avoid permanent supervision under equitable decrees, so it has no virtue as a matter of judicial administration. Nor is it a matter of plain common sense and basic fairness. Why, if Congress meant to prohibit sex discrimination, would it require that male prisoners have less access to educational programs? The much larger number of male prisoners suggests greater criminality of males, and the need for more rather than less rehabilitation effort. Why focus on prisoners' "desires" rather than administrative determinations of what vocational training for prisoners would benefit society when they get out? Though fewer men than women may want courses, society might benefit if more men took courses. Perhaps courses should be given to prisoners who will be out soon, to facilitate their reentry into society, regardless of sex. Reasonable people will differ on what policies are wise and fair. We should leave the policy-making to state prison systems, except insofar as their policy discriminates by sex.

The statutory standard is express: no exclusion, denial of benefits, or discrimination "on the basis of sex."

> No person in the United States shall, *on the basis of sex*, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance....

20 U.S.C. § 1681(a) (emphasis added). Applied to this case, the first clause means that a prisoner cannot be excluded from participation in a federally assisted education program "on the basis of sex." The second clause means that a prisoner cannot be denied the benefits of such a program "on the basis of sex." The third clause means that a prisoner cannot "be subjected to discrimination" under such a program "on the basis of sex."

There is no authority directly on point in Title IX as applied to prisons.[1] Some courts have suggested that Title IX and Title VII should be construed similarly, at least in some contexts. *See, e.g., Lipsett v. University of Puerto Rico,* 864 F.2d 881, 896–97 (1st Cir.1988). Construing Title VII, the Supreme Court held that denial of disability benefits for pregnancy was discrimination on the basis of physical condition, not sex, even

1. The Kentucky district court decision upon which the majority relies says that the Equal Protection Clause "requires parity, not identity, of treatment for female prisoners," a standard which "may be met in a number of different ways, as long as the opportunities available to women are substantially equivalent 'in substance, if not in form' to those accorded men." *Canterino v. Wilson,* 546 F.Supp. 174, 210 (W.D.Ky. 1982). I am unable to find any adoption of the majority's "equality" standard for Title IX in *Canterino* or elsewhere.

though the condition occurs only among females. *General Electric Co. v. Gilbert,* 429 U.S. 125, 135, 97 S.Ct. 401, 407, 50 L.Ed.2d 343 (1976). It did not construe the statutory prohibition of discrimination to require "equality." The Supreme Court held in *City of Los Angeles v. Manhart,* 435 U.S. 702, 711, 98 S.Ct. 1370, 1377, 55 L.Ed.2d 657 (1978), that discrimination occurs when there is "treatment of a person in a manner which but for that person's sex would be different." The majority's "equality" requirement ignores *Manhart's* "but for" requirement.

*Gilbert* and *Manhart* teach us how to construe a statutory prohibition of discrimination "on the basis of sex." The discrimination must be on the basis of sex, rather than some other factor. Discrimination "on the basis of sex" means "treatment of a person in a manner which but for that person's sex would be different." This construction has the virtue of consistency with Supreme Court authority in a parallel context.

The statutory phrase "on the basis of sex" defines and limits the category of prohibited conduct. Discrimination on other bases would not fall within the statutory prohibition. For example, if an individual never convicted of a crime was denied permission to take a prison course, the discrimination would be on the basis of non-prisoner status, not sex, regardless of the sex of the individual and of whether the course were in a men's or women's prison. A person can be excluded from an education program under this section for all sorts of reasons, so long as the exclusion is not "on the basis of sex." Discrimination on the basis of location within the state, confinement, security concerns, literacy, prior education and work experience, and an infinite number of other possible reasons for distinguishing between people would be discrimination on some basis other than sex.

Obviously incarceration, and the attendant security concerns, will require exclusion of prisoners from many of the educational programs provided by the State of Oregon to its law-abiding citizens. If prisoners at Oregon Women's Correctional Center in Salem are denied permission to take courses at Western Baptist College or Willamette University in that city, the discrimination is by criminal status and custody, not sex. People who commit serious enough crimes to be sent to prison lose liberty. They do not have the same rights as everyone else to take advantage of educational opportunities, any more than to enjoy a beer on the porch on a summer evening.

If discrimination is on the basis of penological concerns rather than sex, the discrimination is not prohibited by Title IX. The disagreement between the majority and the district court over the significance of "penological necessity" is immaterial, and inconsistent with the *Manhart* "but for" test. The district court used "penological necessity" as a "defense" to sex discrimination. The majority says "penological necessity" is not a "defense," but is a "concern to be considered in *how* the equality principles of Title IX are to be applied in prisons." Because "penological necessity" is not a quantitative term measurable in a calculation of "equality," I am not sure whether this disagreement is more than semantic. Either way, the statute offers no basis for the use of "penological necessity." If discrimination is on the basis of penal considerations rather than sex, then the discrimination is not on a ground prohibited by the statute. If a difference in treatment of the sexes was penologically necessary, as the district court found, then *a fortiori* the reason for the difference was a penal consideration rather than sex, so it was permissible under the *Manhart* "but for" test.

The difficulty in applying the law against discrimination in educational programs to prisons arises from the separation of the sexes into separate male and female prisons, and the much lower number of females sent to prison. If Oregon offers educational programs with anything like equal opportunity for men and women to enroll, and limits mobility and residential options of prisoners, then the twenty-to-one sex ratio of prisoners will generate some classes available to men and not to women. This is the lack of "equality" which troubles the majority. But numbers matter. Requiring as many programs in the female prison as in the male prison is like saying that there should be as much opera in Ketchikan as in New York. If both sexes had "equality" in the availability

of courses, then the female prisoners would have twenty times as many courses per prisoner available to them as the male prisoners. This vast inequality in courses per prisoner is not required by a statute which prohibits exclusion, denial of benefits, or discrimination "on the basis of sex." Nor does "equality," in any meaningful sense, require that prisoners of one sex have twenty times the freedom of choice as prisoners of the other sex. There cannot be equality of courses per prisoner, and equality of availability of courses, to males and females, where far more males than females are incarcerated. Equality of one variable forces inequality of the other. Equality is an arithmetic impossibility.

No evidence suggests that the prison authorities made their decisions about educational programs on the basis of sex. No finding was made which would support a conclusion that Oregon had discriminated on the basis of sex. One primary consideration for the state prison administrator was location. There are separate prisons for men and women, and for different security classifications. Preferences of prisoners explained some differences in programs. The evidence showed that women were more interested than men in cosmetology and secretarial courses. Regardless of whether one thinks that ought to be so, it was. It would be ridiculous to say that letting a prisoner do what he or she wants, if males and females want different things, is sex discrimination. Under that construction, individual liberty is sex discrimination, until people are forced to think the same thoughts.

Other non-gender reasons explained other differences. Oregon State Correctional Institution (male) but not Oregon Women's Correctional Center had "journeymen" available for some apprenticeship programs, for which no female prisoner applied. Security and supervision concerns precluded women from being assigned to four mechanical trades programs at one of the male prisons, and to sending female prisoners out into the woods with male prisoners in the forest program. In the unchallenged findings of fact, every single distinction between course availability to male and female prisoners is supported by non-pretextual concerns of location, preference, instructor availability, and safety of the public and the prisoners, rather than sex. I would therefore affirm, even though the district court erroneously treated penological necessity as a defense.

Nothing in the majority's opinion prevents the district court from reaching the same conclusion that it did before. This case started in 1983, and has already been through two trials and two appeals. Because of the amorphousness of the majority's "equality" standard, we may well have a third appeal, after whatever proceeding the district court finds necessary on remand. Oregon prison administration will continue to be subject to the power of federal courts, untrammeled by a usable legal standard, to assure that female prisoners obtain "equality" of educational opportunities. This, even though the statute prohibits only discrimination on the basis of sex, none was found, and Oregon accords far greater educational opportunities to female than male prisoners. We have gone astray.