**Vernon MASAYESVA, Chairman of the Hopi Tribal Council of the Hopi Indian Tribe, for and on behalf of the Hopi Indian Tribe, Plaintiff,**

v.

**Peterson ZAH, Chairman of the Navajo Tribal Council of the Navajo Indian Tribe, for and on behalf of the Navajo Indian Tribe, Defendant,**

v.

**Evelyn JAMES, et al., Intervenors.**

**No. CIV 74–842 PCT EHC.**

United States District Court,
D. Arizona.

March 11, 1992.

James E. Scarboro, David C. Warren, Richard P. Barkley, Arnold & Porter, Denver, Colo., for plaintiff.

Terry E. Fenzl, John W. Rogers, Brown & Bain, P.A., Phoenix, Ariz., for defendant.

K. Jerome Gottschalk, Robert M. Peregoy, Edgar T. Bristow, Native American Rights Fund, Boulder, Colo., for intervenors.

## ORDER

Re: lands purchased by or on behalf of the Navajo Nation or privately owned lands relinquished pursuant to Sec. 2 of the 1934 Act.

CARROLL, District Judge.

Defendant Peterson Zah, on behalf of the Navajo Nation,[1] moves for partial summary judgment, requesting that this Court find that the Hopi Tribe and San Juan Southern Paiute Tribe ("the Paiutes" or "Paiute Tribe") do not have a claim to lands which the Navajos contend were either purchased by or on behalf of the Navajo Nation or were privately owned lands relinquished pursuant to Section 2 of the 1934 Act. This order will address two of a number of motions for partial summary judgment by the Navajo Nation seeking to exclude certain categories of land from the adjudication of Hopi and Paiute interests in the 1934 Navajo Reservation.[2] The Hopi Tribe has cross-motioned for partial summary judgment.

Under Section 1 of the Act of June 14, 1934, 48 Stat. 960 (the "1934 Act"), "all vacant, unreserved, and unappropriated public lands ... are permanently withdrawn from all forms of entry or disposal for the benefit of the Navajo and such other Indians as may already be located thereon ..." The Navajo Nation claims that the lands at issue belonged either to the Navajo Nation or to private parties in 1934 and thus are not "vacant, unreserved, and unappropriated." The Hopi and Paiute complaints do not assert claims to privately

---

1. The Navajo Tribal Code, 1 N.T.C. § 301, requires officials of the Navajo Tribe to use the term "Navajo Nation" rather than "Navajo Tribe." Throughout this Order, the Court will use the term employed by the Navajos.

2. This order addresses the Navajo Motion for Partial Summary Judgment Regarding Lands Purchased by or on behalf of the Navajo Tribe Before 1934, and the Navajo Motion for Partial Summary Judgment Regarding Privately-

Owned Lands Relinquished Pursuant to Section 2 of the 1934 Act or Purchased by or for the Navajo Nation after 1934. The Navajo Nation also seeks to exclude lands allotted where patents had been issued to individual Indians, lands allotted where patents had not issued, and lands designated to the State of Arizona for "the support of the common schools"; these issues will be addressed in separate orders.

owned lands relinquished under Section 2 of the Act or validly purchased by the Navajo Nation. Thus, the dispute in this instance is whether certain lands were privately owned or owned by the Navajo Nation in 1934.

*The Santa Fe Pacific Railroad Lands*

First, the parties dispute whether land purchased by the United States "in trust for the Navajo Tribe" from the Santa Fe Pacific Railroad ("Santa Fe") between 1929 and 1932 is subject to Hopi claims. In 1928 through 1931, legislation was enacted directing the Bureau of Indian Affairs to purchase privately held land with Navajo tribal funds from oil and other mineral royalties.[3] *See* Act of May 29, 1928, 45 Stat. 899; Act of March 4, 1929, 45 Stat. 1569; Act of February 14, 1931, 46 Stat. 1122. In 1929 pursuant to this legislation, the United States purchased 52,133.37 acres of land for $1 an acre from Santa Fe with Navajo tribal funds. (*See* Deed, Exhibit 9 to the Affidavit of John Rogers, attached to the Navajo Motion). In 1931, it purchased 24,435.60 acres of land for $1 an acre from Santa Fe, pursuant to a 1931 Congressional appropriation, reimbursable from Navajo tribal funds. (*See* Deed, Exhibit 5 to Affidavit of John Rogers). And in 1932, the United States purchased 28,533.12 acres at $1 an acre with Navajo tribal funds. (*See* Deed, Exhibit 4 to the Affidavit of John Rogers). All of the deeds transferring ownership to the United States "in trust for the Navajo Tribe" were quit-claim deeds.

The Hopi Tribe argues that these deeds did not pass any property interest to the Navajo Nation because ownership had *previously* passed to the United States through a separate transaction. On April 21, 1904, Congress enacted 43 U.S.C. § 149, 33 Stat. 211 (the "1904 Act"), which provided:

> Any private land over which an Indian reservation has been extended by Executive order ["base lands"], may be exchanged at the discretion of the Secretary of the Interior ... for vacant, nonmineral, nontimbered, surveyed public lands of equal value and situated in the same State or Territory ["lieu lands"].

Pursuant to this statute on December 17, 1912, Santa Fe executed a deed conveying its interest in 327,404.44 acres of land (the base lands) within the present borders of the 1934 Reservation to the United States. (*See* Deed, Exhibit 1 to Affidavit of Melanie Morris, attached to the Hopi Cross–Motion). The deed was apparently accepted by the Acting Commissioner of Indian Affairs in the Bureau of Indian Affairs and was recorded in Navajo County on January 11, 1913, and in Coconino County on January 16, 1913.[4]

Santa Fe then sold the rights to the "lieu lands" to developers.[5] However, the Department of the Interior suspended the lieu selections, and asked the railroad to substitute other "base lands" for the lieu lands selected. This substitute transaction was approved by the United States in 1915.[6] The United States did not formally recon-

---

3. *See,* W. Greever, *Arid Domain, The Santa Fe Railway and its Western Land Grant,* at 133–34 (1954), attached as Exhibit 11 to the Affidavit of John Rogers in support of the Navajo Motion; Letter from Special Commissioner Hagerman to Superintendent C.L. Walker, March 12, 1930 attached as Exhibit 12 to the Affidavit of John Rogers; Commissioner of Indian Affairs, *Annual Report to the Commission of Indian Affairs to the Secretary of the Interior for the Fiscal Year Ended June 30, 1932* at 29 (1932) attached as Exhibit 13 to the Affidavit of John Rogers; L. Kelly, *Navajo Indians and Federal Indian Policy 1900–1935* at 121–125 (1968), attached as Exhibit Three to the Affidavit of Richard Barkley in support of the Hopi Cross–Motion.

4. *See* H. Hagerman, *Navajo Indian Reservation,* S.Doc. No. 64, 72nd Cong., 1st Sess., at 13–14 (1932) ("The deed to this last large acreage from the railroad company to the United States was prepared, proffered, accepted, and recorded by the Government ... It is apparent that the deed was accepted and the transaction approved by the Bureau of Indian Affairs"), attached as Exhibit Four to the Affidavit of Richard Barkley; Kelly, *supra* note 3, at 117 ("Although the Department of the Interior refused to accept these lands in exchange for others, the deed of transfer had been recorded and the Navajos continued to use the company's lands").

5. *See* Greever, *supra* note 3, at 93.

6. *Id.,* at 95–98.

vey title to the 327,404 acre base lands initially deeded to it in 1912.

The parties have asserted varying explanations for the suspension of the lieu selections and the substitution of new base lands for those lieu selections. The Hopi Tribe contends that the lieu selections were suspended when the land commission of the State of Arizona protested that Santa Fe was committing a fraud by receiving lieu lands that were more valuable than the base lands relinquished.[7] Further, the Hopi Tribe contends that the United States purchased the land in question in 1929–1932 for the Navajo Nation in order to settle Santa Fe's outstanding claim for compensation or the selection of lieu lands in exchange for the 1912 base lands.[8]

In response, the Navajo Nation argues that the exchange of substituted base lands was due to the fact that the original base lands were not within the scope of the 1904 Act authorizing land exchanges. In a 1924 letter from the Solicitor for the Department of the Interior to the Secretary of the Interior, the Solicitor stated:

> The objection made by the Department in the rejection of this base was that the portions of the reservation wherein these lands are situated were not in permanent reservation but only temporarily withdrawn and not within the contemplated operation of the act of April 21, 1904.[9]

Although the letter does go on to express the opinion that the original exchange would have been authorized by the 1904 Act, the letter does demonstrate that the Department of Interior had decided in or around 1912 that the exchange was not authorized. More significantly, the same letter demonstrates that the Solicitor of the Department of Interior believed that the United States was not required to compensate Santa Fe for the 1912 base lands because other base lands were substituted.[10]

Outside of the excerpts from the books cited, the Hopi Tribe has not introduced any evidence of a claim for compensation by Santa Fe for the 1912 base lands or that the purchase of the 1912 base lands by the Navajo Nation "settled" any outstanding claim by Santa Fe against the United States. In fact, other excerpts from the same books support the Navajo contention that the provision of new base lands was a substitute transaction:

> It will be recalled that the Solicitor's opinion in 1913 denying the validity of the proffered base lands relied on the concept that the executive order creating Leupp had stated that the withdrawal was for the purpose of allotting the Indians residing thereon, and that after such allotment the remainder of the land should be restored to public domain.[11]

In contrast, the Navajo Nation has introduced opinion letters from government officials to support its construction of the transaction.

■ The first legal question is whether title passed to the United States pursuant to this transaction. Ordinarily, the execu-

---

7. *Id.,* at 96 ("The land commission declared that the lieu selections were the choicest of the remaining unappropriated public domain ... It branded the Santa Fe Pacific as 'committing a fraud' in the whole exchange").

8. *Id.,* at 96 ("[Santa Fe] took no action about the original base in the Painted Desert and ... in 1934 finally received cash for it from the Bureau of Indian Affairs").

9. *See* Letter from John H. Edwards, Office of the Solicitor, to Secretary of Interior, February 9, 1924 at 3, Exhibit 41 *to Second Affidavit of* John Rogers, attached to the Navajo reply to its motion; *See also,* Letter from Assistant Secretary of Interior E.B. Finney to Office of Solicitor, Department of Interior, January 11, 1924 (after receipt of the 1912 deed, "the Secretary of Interior held that the exchange did not come within the purview of said act and could not be consummated thereunder"), Exhibit 42 to Second Affidavit of John Rogers; Hagerman, *supra* note 4, at 13 ("it was held by the Attorney General that this transaction could not have been or had not been legally carried out").

10. *See* Letter from John H. Edwards, *supra* note 9 at 7:

> Although the former deed was at first virtually accepted by the Department and was recorded, nevertheless it was finally rejected and the company acquiesced therein by deeding other lands in substitution therefor. That matter may well be considered a closed incident, and I do not believe that any compulsion should be predicated upon it.

11. Kelley, *supra* note 3, at 118, note 11.

tion, delivery, and acceptance of a deed completes the transaction and vests the title in the grantee. *Roosevelt Savings Bank of the City of New York v. State Farm Fire and Casualty Co.*, 27 Ariz.App. 522, 556 P.2d 823, 825 (1976); *Morelos v. Morelos*, 129 Ariz. 354, 356, 631 P.2d 136, 138 (1981). As previously discussed, the Navajo Nation contends that the acceptance of the deed by the Bureau of Indian Affairs was invalid under the 1904 Act, rendering the deed void. The Hopi Tribe argues that this construction of the 1904 Act was incorrect, and that it is irrelevant whether the withdrawal of Indian land pursuant to Executive Order was a permanent or temporary land exchange.

■■■ However, it is unnecessary to decide whether the deed was void, as this Court finds that the government's obligations under the first transaction were discharged. "The parties' consent to a substituted agreement discharged ... obligations under the original contract." *Malanca v. Falstaff Brewing Co.*, 694 F.2d 182, 184 (9th Cir.1982). Further, the title of the United States was unperfected since the land exchange was not complete, and Santa Fe had a right to rescind the contract until it received the lieu lands. *Udall v. Battle Mountain Co.*, 385 F.2d 90 (9th Cir.1967), *cert. denied*, 390 U.S. 957, 88 S.Ct. 1041, 19 L.Ed.2d 1151 (1968). Santa Fe in effect rescinded the original conveyance of base lands when it accepted the substitution of the new base lands in 1915. It was not necessary that the deed be formally reconveyed to Santa Fe to rescind the transaction. *Sumid v. Cairns*, 25 Ariz. 597, 220 P. 1084 (1923).[12]

Finally, the Hopi Tribe has failed to address the significance of the fact that the lands in question were purchased with Navajo tribal funds. Although the Hopi Tribe argues that the Navajo Nation did not actually purchase any interest because Santa Fe did not possess any interest to convey, it is indisputable that the United States used Navajo tribal funds to purchase the land, and that the purchase was intended to aug-

ment the Navajo reservation. "The purchase of land by or for an Indian tribe with tribal funds or statutorily appropriated federal funds vests the tribe with an enforceable property interest irrespective of the form in which the title is held." Felix S. Cohen, *Handbook of Federal Indian Law* 482 (1982 ed.).

■■■ Given that the Navajo Nation has a vested interest in the lands at issue, a holding by this Court that the lands are subject to the claims of the Hopi and Paiute Tribes may subject the government to a claim for an unconstitutional taking; this Court must interpret statutes in a manner which supports their constitutionality, if possible. *Chippewa Indians of Minn. v. United States*, 301 U.S. 358, 376, 57 S.Ct. 826, 833, 81 L.Ed. 1156, *reh. denied*, 302 U.S. 772, 58 S.Ct. 3, 82 L.Ed. 599 (1937). Thus, this Court interprets the statutory language of "vacant, unreserved, and unappropriated" as not including the land purchased from Santa Fe on behalf of the Navajo Nation.

This holding applies both to lands purchased prior to and after 1934 by the Navajo Nation. If the lands were purchased prior to 1934, the Navajo Nation had a vested interest in 1934 rendering the land reserved and/or appropriated. If the lands were purchased from Santa Fe after 1934, the land was privately owned by Santa Fe in 1934 due to the substitution of the new base lands, and the land was also reserved and/or appropriated.

*The Gospel Missionary Union Land*

In 1919, the United States conveyed approximately 80 acres of land to the Gospel Missionary Union for use for mission purposes. Act of June 30, 1919, 41 Stat. 3, 11–12. This statute authorized an executory interest for the Navajo Nation: "Provided, that if said land shall cease to be used for mission purposes the same shall revert to the Navajo Tribe of Indians." On April 23, 1929, the Gospel Missionary Union reconveyed this acreage to the United States. (*See* Deed, Exhibit 10 to Affidavit of John Rogers).

---

**12.** Although the Hopi Tribe argues that this is a "hoary and opaque opinion on peculiar facts", the Hopi Tribe has not cited any Arizona law to

the contrary, and cites only non-Arizona cases in support of its argument that reconveyance was necessary to rescind or cancel the deed.

The Hopi Tribe argues that the Navajo Nation has not shown that this land was purchased with tribal funds or that the purchase from the Gospel Missionary Union was authorized by Congress. Thus, the Hopi Tribe argues that the land was set aside by Executive action and has the same status as an Executive Order reservation, or a "temporary withdrawal", and is subject to Hopi claims.

 The Navajo Nation concedes that it could not discover records indicating whether Navajo tribal funds were used to purchase the Gospel Missionary land, but argues that it is irrelevant in any event. The Court agrees that the reconveyance of the deed transformed the Navajo executory interest to a present vested property interest. *See* Restatement of Property, § 238(a) (termination of fee simple subject to a condition subsequent results in the vesting of the succeeding interest). The executory interest was authorized by Congress in 1919, and the land was therefore not set aside by Executive action. This land is not subject to claims of the Hopi and Paiute Tribes.

*Other lands*

Finally, as to the remaining lands purchased by the Navajo Nation from private parties, the Hopi Tribe argues that the Navajo Nation has not proved that the individuals from whom the Navajo Nation purchased the land actually owned the lands conveyed. If the private parties did not have a legal interest to convey, the Navajo Nation would not have acquired an interest in the lands it purchased prior to 1934. Alternatively, if the private parties did not have a legal interest in the land when the 1934 Act was passed, the lands may have been unappropriated on the date of the Act and subject to Hopi claims, regardless of the subsequent Navajo purchase.

The Navajo Nation introduced deeds for all conveyances; the Hopi Tribe does not challenge their validity. Further, the Navajo Nation also provided tables demonstrating the conveyance histories of the parcels, and an affidavit by a title specialist that no intervening conveyances had been found, except for the Santa Fe lands conveyance. The Hopi Tribe did not challenge any of the evidence provided by the Navajo Nation. Thus, this Court finds that these lands were also reserved and/or appropriated in 1934 and not subject to Hopi and Paiute claims.[13]

Accordingly,

IT IS ORDERED granting the Navajo Motion for Partial Summary Judgment Regarding Lands Purchased by or on behalf of the Navajo Tribe Before 1934 (document # 555), and the Navajo Motion for Partial Summary Judgment Regarding Privately–Owned Lands Relinquished Pursuant to Section 2 of the 1934 Act or Purchased by or for the Navajo Nation after 1934 (document # 560).

IT IS FURTHER ORDERED denying the Hopi Cross–Motions for Partial Summary Judgment as to the same motions (documents # 603 and # 611).

___

13. The Hopi Tribe does not dispute that lands privately owned in 1934 were either relinquished to the Navajo Nation pursuant to Section 2 of the 1934 Act or purchased by or on behalf of the Navajo Nation pursuant to Section 4 of the 1934 Act.