**Vernon MASAYESVA, Chairman of the Hopi Tribal Council of the Hopi Indian Tribe, for and on behalf of the Hopi Indian Tribe; Plaintiff–Appellant,**

v.

**Peterson ZAH, Chairman of the Navajo Tribal Council of the Navajo Indian Tribe, for and on behalf of the Navajo Indian Tribe, Defendant–Appellee.**

**Evelyn James, et al., Intervenors.**

**No. 93–15109.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 9, 1995.

Decided Sept. 11, 1995.

As Amended on Denial of Rehearing and Rehearing En Banc Dec. 5, 1995.

James E. Scarboro, Arnold & Porter, Denver, CO, for plaintiff-appellant.

Terry E. Fenzl, Brown & Bain, Phoenix, AZ, for defendant-appellee.

Before: CHOY, POOLE and KLEINFELD, Circuit Judges.

KLEINFELD, Circuit Judge:

We affirm in most but not all respects the district court decision dividing land between the Hopi and Navajo tribes. The issues

arise from application of a statute Congress passed to deal specifically with this dispute.

## I. Litigation History.

For centuries, the Hopi and Navajo peoples have disagreed on their tribes' respective rights to lands in northeastern Arizona. The dispute has been the subject of extensive litigation and legislation. *See, e.g., Hopi Tribe v. Navajo Tribe*, 46 F.3d 908 (9th Cir.1995), *citing Healing v. Jones*, 210 F.Supp. 125, 129 (D.Ariz.1962), *aff'd*, 373 U.S. 758, 83 S.Ct. 1559, 10 L.Ed.2d 703 (1963) (per curiam). After a district court decision in 1978, *Sekaquaptewa v. MacDonald*, 448 F.Supp. 1183 (D.Ariz.1978), we remanded for additional findings. *Sekaquaptewa v. MacDonald*, 619 F.2d 801 (9th Cir.1980). The judgment we review now is based on three separate decisions: *Masayesva v. Zah*, 816 F.Supp. 1387 (D.Ariz.1992) (partitioning land and lifting development freeze); *Masayesva v. Zah*, 793 F.Supp. 1495 (D.Ariz.1992) (deciding question of where Hopis were located in 1934); *Masayesva v. Zah*, 792 F.Supp. 1155 (D.Ariz.1992) (holding land acquired from railroads not subject to Hopi claims).[1]

On December 16, 1882, President Chester Arthur by executive order set aside land in northeastern Arizona "for the use and occupancy of the Moqui [Hopi] and such other Indians as the Secretary of the Interior may see fit to settle thereon." *Hopi Tribe v. Navajo Tribe*, 46 F.3d 908, 911 (9th Cir. 1995). The Hopi 1882 reservation has been the subject of much litigation between the Navajo and Hopi tribes. *See, e.g., id.; Sekaquaptewa v. MacDonald*, 575 F.2d 239 (9th Cir.1978); *Hamilton v. MacDonald*, 503 F.2d 1138 (9th Cir.1974); *Healing v. Jones*, 210 F.Supp. 125 (D.Ariz.1962); *Healing v. Jones*, 174 F.Supp. 211 (D.Ariz.1959).

A half century later, Congress established a much larger Navajo reservation. Act of June 14, 1934, 48 Stat. 960 (the "1934 Act"). This reservation was not only for the Navajo people, but also for "such other Indians as

may already be located thereon," and it did not take away any of the Hopi reservation created in 1882:

> Be it enacted ... [t]hat the exterior boundaries of the Navajo Indian Reservation, in Arizona, be, and they are hereby, defined as follows.... All vacant, unreserved, and unappropriated public lands ... are hereby permanently withdrawn from all forms of entry or disposal for the benefit of the Navajo and such other Indians as may already be located thereon; however, nothing herein contained shall affect the existing status of the Moqui (Hopi) Indian Reservation created by Executive order of December 16, 1882....

In 1974, almost a half century after creation of the Navajo reservation, and almost a century after creation of the Hopi reservation, Congress passed a law enabling the Navajo and Hopi tribes to sue each other as a means of settling their continuing dispute over which tribe was entitled to which lands in the 1934 reservation. Each tribe was authorized to sue the other in district court "for the purpose of determining the rights and interests of the tribes in and to such lands and quieting title thereto in the tribes." 25 U.S.C. § 640d–7(a). The Hopis commenced the case at bar in accord with the Congressional authorization.

We addressed the question "[w]hat property interests are conferred by the phrase [in the 1934 Act] 'for the benefit of the Navajo and such other Indians as may already be located thereon?'" in our earlier decision in this case. *Sekaquaptewa*, 619 F.2d at 805. The Hopis had argued that the phrase gave them a half interest in the entire Navajo reservation, because they were "such other Indians as may already be located thereon," and the reservation was conferred for the benefit of the Navajo and "such other Indians...." The district court had held that the Hopis were entitled to interests only in the lands upon which they were located in

---

1. The district court also decided claims to the Navajo Reservation brought by the San Juan Southern Paiute Tribe. These decisions are not before us in the present appeal. *See Masayesva v. Zah*, 794 F.Supp. 899 (D.Ariz.1992); *Masayesva v. Zah*, 792 F.Supp. 1165 (D.Ariz.1992); *Ma-*

*sayesva v. Zah*, 792 F.Supp. 1178 (D.Ariz.1992). Certain other decisions in this case are also not before us on appeal. *See Masayesva v. Zah*, 792 F.Supp. 1160 (D.Ariz.1992); *Masayesva v. Zah*, 792 F.Supp. 1165 (D.Ariz.1992); *Masayesva v. Zah*, 792 F.Supp. 1172 (D.Ariz.1992).

1934, and on those lands, they were entitled only to an undivided half interest with the Navajos, not an exclusive interest.

We rejected the interpretation that the statutory phrase conferred joint interests, either in Hopi-occupied land only or in the entire 1934 reservation. We held that it conferred an exclusive interest in the Hopis, but only to the lands they occupied in 1934. We concluded that "[t]he purposes, history, and language of the 1934 Act show an intent to withdraw all reservation land for the Navajos except for pockets occupied by the Hopis. . . . [T]his is the meaning of the 'such other Indians as may already be located thereon' provision." *Id.* at 807. We rejected the district court's decision that "located thereon" created only a half interest in the Hopi-occupied areas of the Navajo reservation. We held that the Hopis were to take such "pockets" exclusively of the Navajos.

> [L]egislative intent is clear enough to enable us to identify Hopi interests by areas settled. Navajo interests are identifiable as the residue. Congress recognized Hopi concern over the 1882 reservation and their villages, shrines, and grazing areas outside the 1882 reservation. The "such other Indians" provision was explained to the Hopis as protecting their rights to areas occupied outside the 1882 reservation. . . . We therefore reverse the [district court's] judgment insofar as it limits Hopi interests to an undivided one-half interest in lands they exclusively possessed, occupied, or used in 1934. Judgment should be entered declaring Hopi interests in those lands to be exclusive.

*Id.* at 808. We then remanded the case with these instructions:

> We remand to the district court to determine what land the Hopis "possessed, occupied, or used" in 1934. In doing so, we acknowledge the possibility that some reservation land, grazing land for instance, may have been used by both tribes in 1934. Even in villages it may not be possible for the court to conclude that the Hopis "pos-

sessed, occupied, or used" such land exclusively. In that event it may be proper on remand for the district court to declare title to be joint or undivided, subject to partition. We reverse only with respect to the district court's holding that Hopi title is necessarily non-exclusive, even with respect to land that was actually and exclusively "possessed, occupied, or used" in 1934.

*Id.* at 809–10 (emphasis added).

Upon remand, the district court held a bifurcated trial. In the first phase, the court tried the issue of which land was occupied exclusively by the Hopis in 1934, which the parties agreed was the relevant year under the statute. *Masayesva v. Zah*, 793 F.Supp. 1495 (D.Ariz.1992). In the second phase, the court tried the issue of what to do with lands occupied by both tribes in 1934. *Masayesva v. Zah*, 816 F.Supp. 1387 (D.Ariz.1992). During this second phase, the court took evidence on contemporary land use and occupancy, for purposes of deciding upon equitable partition. The land occupied by both tribes in 1934 was partitioned by the court, pursuant to 25 U.S.C. § 640d–7(b), which requires that "[a]ny lands in which the Navajo and Hopi Tribes . . . are determined to have a joint or undivided interest shall be partitioned by the District Court on the basis of fairness and equity. . . ."

## II. Analysis.

### A. "Located thereon."

The district court construed the 1934 statutory term "located" to mean something more than the level of possession, occupancy or use which might be used in different contexts to establish aboriginal title. "[T]his court will not apply the same standard regarding the *intensity* of 'possession, occupancy, and use' required to establish aboriginal title. The Hopi Tribe's claims in this case are based on *recognized title* granted by the 1934 Act." *Masayesva*, 793 F.Supp. at 1500 (emphasis in original).[2] Although the district court required more substantial occu-

---

2. Recognized title is "title to Indian lands that has been recognized by federal . . . statute." William C. Canby, Jr., *American Indian Law* 226 (1st ed. 1981). "The nature and extent of the rights and title of Indians in a reservation . . . are measured by the terms of the governing act or treaty." 42 C.J.S. Indians § 72(b) (1991).

pancy than for aboriginal title, it rejected the Navajo argument that continual physical presence was necessary. Here is the standard that the district court applied to the evidence, in order to determine which pockets of land were occupied by the Hopi tribe:

The Court finds that the use by Hopi Indians must be substantial and sufficiently intensive in order to create a property interest in the 1934 Reservation, though the use does not have to be for subsistence purposes. Use by a few isolated individuals, especially when away from traditional use areas of that individual's Tribe, and irregular or sporadic uses are not sufficient. However, since seasonal use is pervasive in Indian land use patterns, and indeed necessary in the harsh environment of the 1934 Reservation, substantial seasonal use is sufficient for this Court to find occupation or use of the land.

*Id.* at 1501.

The Hopis argue that this standard was erroneous as a matter of law, because it required more intensive use and occupancy than the aboriginal title cases ordinarily do. We assume for purposes of discussion, without deciding, that the Hopis are correct in their argument that the district court imposed a more stringent requirement than the one which has evolved in aboriginal title cases. We conclude, nevertheless, that the district court correctly construed the statutory phrase "located" in this statute.

Our use of the phrase "possessed, occupied, or used" in our 1980 decision was not intended to import a particular level of intensity into the level of usage which would suffice under the statutory term "located." We used the terms "settled" and "occupied" as well. We did not distinguish which of these different levels of intensity were sufficient to satisfy the statutory term "located," because that was not the issue we were deciding. We were resolving the question of whether the statute conferred to the Hopi tribe a half interest in the whole reservation, a half interest in the areas the tribe occupied, or an exclusive interest in the areas occupied. The district court was correct, on remand, in not reading into the phrase "possessed, occupied or used" a decision on the intensity of use.

*See United States v. Andrade–Larrios,* 39 F.3d 986, 990 (9th Cir.1994) (noting distinction between holding and dictum).

■ The Hopis argue that the district court erred in "apparently equat[ing] 'use, occupation, or possession' with the term 'located' as used in the 1934 Act." What we, and the district court, must apply is precisely that Act. Congress in 1934 used the term, "located." This word was not a term of art connoting lands which people merely passed over occasionally or otherwise used to a very low level of intensity. The district court's construction was consistent with the ordinary meaning of the word. It was well designed to serve the purpose of the 1934 Act:

Congress recognized Hopi concern over the 1882 reservation and their villages, shrines, and grazing areas outside the 1882 reservation. The "such other Indians" provision was explained to the Hopis as protecting their rights to areas occupied outside the 1882 reservation.

*Sekaquaptewa,* 619 F.2d at 808. We review the district court's construction of the statute *de novo, Jeldness v. Pearce,* 30 F.3d 1220, 1222 (9th Cir.1994), and conclude that it was correct and a correct implementation of this court's mandate in *Sekaquaptewa.*

We reject the Hopis' argument that "located" must be construed to mean the same thing as "possession, occupation, or use" under decisions by the Indian Claims Commission and Court of Claims. *See* 25 U.S.C. §§ 70–70v (now omitted); 28 U.S.C. § 1505. *See generally* Felix S. Cohen, Handbook of Federal Indian Law 160–62 (1982 ed.); William C. Canby, Jr., American Indian Law 228–31 (1st ed. 1981). The Indian Claims Commission was authorized, *inter alia,* to hear claims "arising from the taking by the United States ... of lands owned or occupied by the claimant without the payment for such lands of compensation agreed to by the claimant." 25 U.S.C. § 70a. This provision permitted compensation for the taking of land held pursuant to aboriginal title:

Indian tribes that occupied and used the land to the exclusion of others (except for mere temporary excursions) had an interest denoted as a "right of occupancy."

This right later came to be known as "original Indian title" or sometimes simply as "Indian title" or "aboriginal title." That title cannot be compromised by any other party except the federal government. [citations omitted] ... A taking by the federal government of lands held by original Indian title does not give rise to any right of compensation under the Fifth Amendment. [citation omitted] In this respect original title is to be distinguished from "recognized title".... A taking of original Indian title by the federal government may ... provide the basis for a claim under the Indian Claims Commission Act of 1946.

Canby, *supra*, at 223–24. *See also* Cohen, *supra*, at 491–92 ("Of course, Congress can provide compensation for the taking of original Indian title [although it does not have to do so].... The Indian Claims Commission Act was a congressional program of limited retrospective compensation for extinguishment of Indian title").

The line of cases on which the Hopis rely to construe the phrase "possession, occupation, or use" began twelve years after the 1934 Act was passed. Congress could not have meant to use a meaning not yet given to a phrase it did not use, when it wrote "located" into the 1934 statute. Moreover, the Hopis are not litigating their aboriginal title to these lands, but rather the recognized title conferred on them by the 1934 Act. The district court in an earlier decision took note of a previous determination that Hopi usage in these areas had been insufficient to establish aboriginal title under a less stringent standard than that in the 1934 Act. *Sekaquaptewa*, 448 F.Supp. at 1188 (citing *Hopi Tribe v. United States*, 31 Ind.Cl.Comm. 16 (1973); *Hopi Tribe v. United States*, 23 Ind. Cl.Comm. 277 (1970)). The land described in a statute as subject to recognized title "may or may not have been part of the aboriginal territory of the tribe." Canby, *supra*, at 226. *See also* 42 C.J.S. Indians § 72(b) (1991) ("The nature and extent of the rights and title of Indians in a reservation do not depend on aboriginal possession, but are measured by the terms of the governing act....").

The district court's findings of fact as to the nature, scope, and intensity of Hopi land use are reviewed for clear error. Fed. R.Civ.P. 52(a); *Campbell v. Wood*, 18 F.3d 662, 681 (9th Cir.) (en banc), *cert. denied*, —— U.S. ——, 114 S.Ct. 2125, 128 L.Ed.2d 682 (1994). Application of principles of law to facts are mixed questions of law and fact. Under *United States v. McConney*, 728 F.2d 1195, 1202–04 (9th Cir.1984) (en banc), we review the district court's application of law to facts for clear error where it is "strictly factual," but *de novo* where application of law to fact requires "consideration of legal principles."

The district court made extensive findings about the extent of non-religious but traditional activities such as gathering plants, wood for construction and fires, materials for use in tools, and so forth. *Masayesva*, 793 F.Supp. at 1528–30. It decided that the Hopi use of the widespread areas in which these activities took place was not so regular or extensive as to amount to the Hopis having been "located" there. *Id.* The court found that many such places were used depending on where an individual happened to be travelling, were used less often than once a year, or otherwise were not particular areas regularly used. *Id.* The Hopis do not contest the district court's factual findings as to the nature, extent, intensity and duration of this traditional land usage. The district court findings regarding these areas were not clearly erroneous.

Because we have concluded that the district court correctly construed the statutory term "located," the Hopis' argument that the case should be remanded for application of a less intensive "occupied or used" standard is necessarily rejected. The Hopis make two arguments about location in 1934 that are not controlled by this determination: (1) the district court failed to apply the standard correctly to areas where their religious uses were located in 1934; (2) the findings on where they grazed in 1934 were clearly erroneous.

1. Religious locations.

The district court rejected the Hopi claims to religious locations.

[T]he Hopi Tribe claims in the 1934 Reservation based on the eagle gathering activi-

ties, visiting shrines, and gathering of ceremonial plants and animals are not sufficient "occupation, use and possession" to establish a property interest for exclusive use or partition purposes.

*Id.* at 1528. The religious locations included places visited for religious rituals and marked with rock cairns, petroglyphs, or hidden depositories for offerings. The Hopis also had traditional areas where eagle feathers were gathered for ceremonial purposes and shrines within those areas. The court also rejected Hopi title to traditional areas for gathering fir boughs, wild tobacco, and animals for use in religious ceremonies.

■ The district court gave three reasons for this rejection. All three require "consideration of legal principles" and are not "strictly factual," so we review *de novo*. *McConney,* 728 F.2d at 1202–04.

■ First, the district court held that a 1974 statute entitling tribes to Interior Department protection of religious access obviated any claim of title:

> Notwithstanding anything contained in this Act to the contrary, the Secretary shall make reasonable provision for the use of and right to access to identified religious shrines for the members of each tribe on the reservation of the other tribe where such use and access are for religious purposes.

25 U.S.C. § 640d–20. On the basis of this statute, the district court concluded:

> Given that access to religious shrines will be protected, the Hopi Tribe cannot persuasively argue that their presence gives the Hopi Tribe a property interest in the 1934 Reservation.

*Masayesva,* 793 F.Supp. at 1527.

We reject the district court's reasoning. The religious access statute was passed almost a half century after the 1934 Act. If the Hopis became entitled to property under the 1934 Act, they could not lose it because subsequent legislation added to their protection. The statute is not superfluous, even for shrines the Hopis own. For example, it protects each tribe's right to cross other tribes' land to reach its shrines, to decide who can go to the shrines, to control maintenance, and to such other protections as may be necessary for appropriate religious use.

This 1974 religious access statute cannot, however, have any bearing on whether the Hopis were "located" at a particular shrine in 1934. If they were, they are entitled to the shrine, regardless of the terms of the 1974 statute, and even if Congress were to repeal it.

■ Second, the district court held that allowing Hopi religious use to establish a property interest would contradict *Lyng v. Northwest Indian Cemetery Protective Ass'n,* 485 U.S. 439, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988). While we agree with the district court that a religious use does not by itself create a property interest, the property interest in the Hopi religious shrines is created by the 1934 Act, not the religious use by itself. As we said in our previous decision, one of the purposes of the 1934 Act was to protect the Hopis' rights to "areas occupied outside the 1882 reservation" by "shrines." *Sekaquaptewa,* 619 F.2d at 808. *Lyng* and *Manybeads v. United States,* 730 F.Supp. 1515 (D.Ariz.1989), were First Amendment cases; this is a property rights case. If the Hopis were "located," for a religious use, on certain land in 1934, then this was among the "pockets occupied" to which they obtained title under the 1934 Act.

■ Third, the district court held that the religious uses were not sufficiently intensive to satisfy the statutory "located" criterion. For example:

> Eagle gathering occurred only once a year, with only a small number of men involved. The Hopi Tribe failed to demonstrate that a substantial number of Hopis travelled to shrines outside the immediate vicinity of the Hopi villages in the 1930's, and many of the shrines are often only known to a small number of Hopis.

*Id.* at 1528. Because this conclusion was largely legal, depending on whether annual use or use by small numbers of people, sufficed, rather than "strictly factual," we review it *de novo*. *McConney,* 728 F.2d at 1202–04.

We cannot accept that once a year use is too infrequent for a tribe to be "located" at a religious site. Many religious observances take place only once a year, e.g., Yom Kippur, Christmas, Easter. Nor does use by only a few people, or people of only one sex,

disqualify a religious site. Many religions require that access to a holy site be limited to a designated few people and to special times. In the Jewish religion, only one man, the high priest, could enter the holiest location, and he could do that only once a year. *See* Leviticus 16 (only Aaron could enter the innermost shrine, and only on the tenth day of the seventh month, to make expiation for the sins of all Israelites). Many shrines, such as Mecca and the Western Wall, are holy to a religion, even though most of its adherents have never been there. Some holy sites, such as the Tomb of the Patriarchs in Hebron, are known only to a minority of adherents of the religion. Some religions, such as that of the Druse, are largely secret even from their own adherents who have not obtained a particular status within the religion. Some religions limit participation in certain rites to men, or to priests. The district court demanded a level of intensity of occupancy of Hopi holy sites which would be inconsistent with the practices of many religions.

We remand, so that the district court can award identifiable locations regularly and exclusively used for religious observances or activities by the Hopis to that tribe. Locations that were regularly used by both Hopi and Navajos may be determined to be subject to partition "on the basis of fairness and equity." 28 U.S.C. § 640d–7(b). A religious shrine marked by a physical object or marking, such as rock cairns, petroglyphs, and hidden depositories for offerings, is an identifiable location. The district court must determine whether the eagle feather gathering and other religious hunting and gathering areas are sufficiently identifiable and subject to demarcation of boundaries so that the Hopis were "located" there in 1934.

■ We affirm the district court's conclusion that "the evidence ... reflects that ceremonial plant gathering was sporadic and at irregular intervals" and usually occurred "around the vicinity [of] Moenkopi, off-reservation ... or inside the 1882 reservation." *Masayesva*, 793 F.Supp. at 1528. Sporadic activity at irregular intervals over a general area not subject to precise demarcation is not a place where the Hopis were "located" in 1934.

Where the Hopis can show for 1934(1) physical evidence of a shrine, such as a rock cairn or petroglyphs, or (2) regular (such as annual) religious use of a specific and identifiable area (as may be the case with eagle feather gathering), that is enough to show location. This does not imply that the Hopis are entitled to all of Hopitutskwa. The district court must use its discretion to allocate a reasonable amount of land around the shrine or regular use area to provide for its appropriate use and maintenance and reasonable access thereto.

2. Grazing.

■ The Hopis argue that the district court erred in its findings of fact regarding the extent of the grazing area in which the Hopis were "located" in 1934. This issue is purely factual, so we review for clear error. *Campbell*, 18 F.3d at 681. "[R]eview under the 'clearly erroneous' standard is significantly deferential, requiring a 'definite and firm conviction that a mistake has been committed.'" *Concrete Pipe and Products of California, Inc. v. Construction Laborers Pension Trust for Southern California,* —— U.S. ——, ——, 113 S.Ct. 2264, 2280, 124 L.Ed.2d 539 (1993).

■ The district court made meticulous findings of fact, supported with detailed reference to the evidence, in its decision after the first phase of the trial to decide where the Hopis grazed their herds in 1934. *Masayesva*, 793 F.Supp. at 1509–26. At the end of the second phase of the case, deciding on a fair and equitable partition of the areas jointly occupied in 1934, the court refined its findings regarding 1934 occupancy. *Masayesva*, 816 F.Supp. at 1397–1401.

The Hopis suggest that the court incorrectly mixed together the question of where they were located in 1934, with what would be a fair and equitable partition based on modern-day location. The court stated that it was distinguishing the two questions:

> On April 27, 1992, this Court issued its Findings of Fact and Conclusions of Law regarding the Hopi interest in the 1934 Reservation.... The earlier Findings generally described the areas which the Hopis had exclusively or jointly used in 1934 based on evidence presented at the trial held between October 17, 1989 and February 8, 1990 (Phase I of this proceeding).

This opinion will more specifically delineate the boundaries of the area which this Court found Hopis had exclusively used, and that area found to have been jointly used by the Hopis and Navajos in 1934. This Court will then partition the joint use area.... *Masayesva*, 816 F.Supp. at 1394. While we might draw different inferences from some evidence than did the district court, we are unable to conclude, under the applicable standard of review, that the district court clearly erred.

The Hopis present a careful argument for why the evidence should have compelled a different conclusion on three geographic areas. On each, however, we conclude that the district court did not clearly err.

a. Ward Terrace

The district court initially found that "the Navajos and Hopis jointly grazed throughout the Ward Terrace area in 1934." *Masayesva*, 793 F.Supp. at 1517. The court subsequently amended its findings of fact to clarify what it meant by "Ward Terrace." The court decided that the Hopis had not shown that an area bounded by Ward Terrace on the east, Highway 89 to Cameron on the west, and the Little Colorado River on the southwest, had been used substantially, and so excluded it from the joint use area. *Id.* at 1534. The court also delimited the southern boundary of Hopi use in the Ward Terrace area. *Id.* at 1534–35.

The Hopis argue that the district court erred in concluding that "129–300 cattle could not have intensively used the entire Ward Terrace" and that Hopi use was therefore not sufficiently substantial to constitute location. *Id.* at 1535, n. 6. However, the district court explained in footnote 6 why it rejected the Hopi evidence. The court pointed to one witness' lack of specificity, the inconsistency of another witness' testimony, and the failure of proof of intensive, frequent use. The district court's findings as to Ward Terrace were not clearly erroneous.

b. Eastern Portions of Coal Mine Mesa and Moenkopi Plateau

The court found that Coal Mine Mesa was jointly used. *Id.* at 1524. As to Moenkopi Plateau, the court found that the evidence "clearly support[ed]" the Hopi claim of grazing on the western and northern portions of the Plateau. *Id.* at 1517. The court also found that portions of the central and southern Moenkopi Plateau were used exclusively by Hopis but that other portions were jointly used. *Id.* at 1521–22. Before the partition phase of the trial, the court delimited a southern boundary to the Moenkopi Plateau joint use area. *Id.* at 1535.

However, the court did not set precise boundaries to the Moenkopi Plateau and Coal Mine Mesa joint use areas until *after* the partition phase of the trial had ended. *Masayesva*, 816 F.Supp. at 1399–1401. The Hopis argue that the boundary finally set eliminated the possibility of a contiguous Hopi reservation by creating a Hopi no-use zone between the joint use area and the 1882 Hopi reservation. They contend that there was substantial evidence that Hopis did in fact graze in the no-use zone, up to and past the borders of the 1882 Hopi Reservation.

The district court did not commit clear error. The court concluded that one witness's testimony was not credible. *Masayesva*, 793 F.Supp. at 1521, n. 106; 1535, n. 7. "[D]ue regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." Fed.R.Civ.P. 52(a). Another witness's testimony was found not to be specific nor to establish the intensity of grazing. *Id.* at 1535, n. 7. Our previous determination that the 1934 Act gave the Hopis "pockets" of land they occupied in the 1934 reservation implicitly rejects the proposition that the areas awarded to them need be contiguous to each other or the 1882 reservation. There is no clear error.

c. Area North of Moenkopi Wash, Including Pasture Canyon

The court initially found that "Pasture Canyon was jointly used by Hopis and Navajos in 1934." *Id.* at 1515. It subsequently restricted the joint use area to "Pasture Canyon south of the Government Pasture" and refused to include any land around the canyon floor. *Masayesva*, 816 F.Supp. at 1399. The court also found that "Hopis did not graze their livestock north of Moenkopi Wash (except in Pasture Canyon ...)." *Ma-*

*sayesva,* 793 F.Supp. at 1526. However, the court later determined that "there was evidence of [two] Hopi sites *north* of Moenkopi Wash." *Masayesva,* 816 F.Supp. at 1399 (emphasis in original).

The Hopis claim that there was "substantial evidence" that Hopis grazed livestock north of Moenkopi Wash in 1934. They also dispute the district court's conclusion that there was no evidence of Hopi grazing outside of the floor of Pasture Canyon.

Again, the district court's findings are not clearly erroneous. The Hopis presented evidence of some use of this area, which the district court recognized. *Masayesva,* 793 F.Supp. at 1526, n. 127. The court found some of the testimony implausible or contradictory. There was no clear error.

B. Equitable Partition.

■ The statute required the district court to partition lands in which the two tribes had a joint interest in 1934:

> Any lands in which the Navajo and Hopi Tribes or Navajo or Hopi individuals are determined to have a joint or undivided interest shall be partitioned by the District Court on the basis of fairness and equity and the area so partitioned shall be retained in the Navajo Reservation or added to the Hopi Reservation respectively.

25 U.S.C. § 640d–7(b). The district court partitioned about three quarters of the jointly held land to the Navajos, about one quarter to the Hopis. The Hopis argue that the partition should have been equal. The interpretation of 25 U.S.C. § 640d–7(b) is a question of law reviewed *de novo. Jeldness,* 30 F.3d at 1222. The district court's partition decision, based on "fairness and equity," is reviewed for abuse of discretion. *Sekaquaptewa v. MacDonald,* 575 F.2d 239, 244 (9th Cir.1978).

■ We reject the argument that the partition had to be equal. The Hopis argue that at common law, when property held by tenants in common is partitioned, the shares are equal. The partition at issue was on the basis of a statute, not common law. We also reject the argument that because jointly held land in the Hopi reservation was partitioned equally, so must land in the Navajo reservation. Congress had rejected the "fair and equitable" language for the Hopi Reservation partition which it adopted for the Navajo Reservation partition. *See Healing v. Jones,* 210 F.Supp. 125, 190–91 (D.Ariz.1962). The subsequent statutory provision for dividing jointly held land in the Hopi reservation was different from the one for the Navajo Reservation. *See* 25 U.S.C. § 640d–5.

■ The Hopis argue that the district court gave the Navajos the benefit, in deciding upon a fair and equitable division, of areas the Navajos had settled in violation of the Bennett Freeze. (*See* Part II–E, *infra*). In principle, the Hopis are correct that it would not be "fair and equitable" to give the Navajos more land based on their own wrongdoing. "He who comes into equity must come with clean hands." Henry L. McClintock, *McClintock on Equity* 59 (1948). We are unable to conclude, however, that the district court awarded any more of the jointly held lands to the Navajos than it would have awarded absent the freeze violations that occurred, or that any of the award to the Navajos results from freeze violations. The district court concluded that "most of the Navajo sites [violating the Bennett Freeze] fall within the areas where Navajo families have been since before 1966 [the implementation date of the pre-statutory "Bennett Freeze"]...." *Masayesva,* 816 F.Supp. at 1416. The district court would have given those areas to the Navajos even if the homesites had not been built. Only three new homesites, as opposed to improvements at preexisting homesites, violated the freeze, so the effect on the partition was *de minimis* in any event.

■ We agree with the district court that the statutory term "fairness and equity" does not mean that jointly held lands must be equally divided between the two tribes. The statute says the partition must be based on "fairness and equity," not equal division between the two tribes. Equality between tribes would be capable of arithmetic precision, but "fairness and equity" is necessarily discretionary. Fairness and equity require that each tribe have its due, not that each have an equal share, and equal shares awarded to parties unequal in relevant respects would be unjust. *See* Aristotle, *Nicomachean Ethics,* Book V, Chapter 6. The district court considered five factors to determine a

fair partition, four of which are principles justifying modification of an equal division:

> The partition line takes a number of factors into account, including (1) avoiding the relocation of individuals, (2) avoiding the disruption of grazing areas as much as possible, (3) providing 50% of the joint use area acreage to the Hopi Tribe, to the extent possible, (4) fairly and equitably distributing water sources, and (5) ensuring the feasibility of future administration of the partitioned areas, including fencing.

*Masayesva,* 816 F.Supp. at 1418. Considering the broad discretion in the district court implied by the statutory phrase, "shall be partitioned by the District Court on the basis of fairness and equity," we cannot conclude that the use of any of these factors amounted to an abuse of discretion.

■ The district court said "the most important factor is avoiding the relocation of individuals." *Id.* It adjusted the partition so that "every Navajo homesite is located on land partitioned to the Navajo Nation" and "every Hopi home and ranch site is located on land partitioned to the Hopi Tribe." *Id.* While the statute does not compel this result, the district court had discretion so to adjust the division, so long as the adjustments did not otherwise cause the division to be inequitable.

The Hopis argue that the district court gave too much weight, in deciding where Navajos were located and should not be displaced, to seasonal locations.

> Many Navajos ... live part-time in Tuba City (or other towns on the Reservation) and part-time (generally weekends and summers) at their homesites. This part-time use of the homesites is important to these people; often many generations have lived at these homesites (or sites close by within a customary use area), and their periodic return is necessary for conducting livestock operations. Thus, the Court will attempt, as much as is possible, to place full-time *and* part-time residences of Navajos on land partitioned to the Navajo Nation.

*Id.* at 1414 (emphasis in original). Consideration of this extent of use was not an abuse of discretion.

We are unable to conclude that the district court's partition of the joint use land was so unfair or inequitable as to amount to an abuse of discretion. We affirm.

## C. Railroad Land.

■ The district court did not make occupancy findings regarding certain lands which the Navajos obtained from the Santa Fe Railroad. Instead, it granted summary judgment for the Navajos, on the ground that this was not part of the vacant and unappropriated land which the 1934 Act apportioned to the Navajos and "such other Indians as may already be located thereon." *Masayesva,* 792 F.Supp. at 1159. We review *de novo, Jesinger v. Nevada Federal Credit Union,* 24 F.3d 1127, 1130 (9th Cir.1994) and affirm.

The United States conveyed the lands at issue to the Santa Fe Railroad in the 1860's. In 1904, Congress provided that railroads could exchange lands in Indian reservations for other lands of equal area and value in lieu of the reservation lands:

> Any private land over which an Indian reservation has been extended by Executive order, may be exchanged at the discretion of the Secretary of the Interior and at the expense of the owner thereof and under such rules and regulations as may be prescribed by the Secretary of the Interior, for vacant, nonmineral, nontimbered, surveyed public lands of equal area and value and situated in the same State or Territory.

43 U.S.C. § 149.

The Santa Fe conveyed lands on what later became the Navajo Reservation in 1912, as part of such an anticipated exchange. The United States recorded Santa Fe's deed, but did not give Santa Fe "lieu lands" in return. This failure to complete the exchange may have resulted from a dispute about value of the lands to be exchanged. Santa Fe then conveyed other lands to the government, and the government conveyed lieu lands to the Santa Fe, in 1915.

The base lands conveyed by the Santa Fe in 1912 were not reconveyed by any instrument back to the Santa Fe. Nevertheless, the Santa Fe sold them to the government again. Between 1929 and 1932, the Santa Fe conveyed them by quitclaim deed to the

United States in trust for the Navajo Tribe. *Masayesva*, 792 F.Supp. at 1157. The United States used Navajo tribal funds to buy the lands. *Id.*

The Hopis argue that the United States already owned the railroad lands in 1912, so the quitclaim deeds in 1929–32 did not convey anything. The Navajos argue that the 1912 conveyance was rescinded by implication, when the United States refused to convey the lieu lands in exchange, so the land was acquired in trust for the Navajos in 1929–32, and was therefore not part of the unappropriated land subject to ownership by "such other Indians as may already be located thereon" under the 1934 Act.

It is plain from the fact of their purchase that the United States and the Navajos understood, in 1929–32, that the Santa Fe owned an interest in the lands. It is also plain, from the terms of the conveyance, that the Navajos and the United States intended, in 1929–32, that the lands should be held in trust for the Navajo Tribe. Had the United States been able to convey the lands into trust for the Navajos without paying the Santa Fe for quitclaim deeds, as it could if it owned the land, there is no reason to doubt that this would have been done.

 There is law supporting the proposition that a conveyance in the circumstances of the Santa Fe's 1912 conveyance is subject to an equitable claim for rescission if the lieu lands are not conveyed. *State of Oregon v. Bureau of Land Management,* 876 F.2d 1419, 1427–28 (9th Cir.1989); *Udall v. Battle Mountain Co.,* 385 F.2d 90, 94 (9th Cir.1967). *Sumid v. Cairns,* 25 Ariz. 597, 220 P. 1084, 1085 (1923).

> Since the relinquishment to the United States contemplated a completed exchange of lands, an equity in the nature of a right to rescission remained with the owner of the relinquished land until the exchange had been completed and it was not until then that the United States might be regarded as vested with unconditional ownership.

*Battle Mountain,* 385 F.2d at 94.

In the circumstances of this case, the Hopi argument would establish that the United States acquired bare legal title in 1912, subject to an equitable claim of rescission owned by the Santa Fe. The 1915 exchange is subject to two interpretations, either that it was an alternative to the failed 1912 exchange, or that it was a conveyance of Santa Fe lands in addition to those conveyed in 1912, bringing the value up to a level which satisfied the government. The purchase by the government in 1929–32 implies that the first interpretation is the one which the parties thought to be correct. The government did not obtain the equitable interest in the railroad lands until 1929–32. The Santa Fe did indeed own something when it conveyed its interest in 1929–32 by quitclaim deeds: the equitable right to the lands. The interest was then purchased with Navajo money and was subject to a trust on behalf of the Navajos. The district court correctly held that this land was not part of the unappropriated lands subject to the 1934 Act.

### D. Boarding School Land.

 The district court found that in 1934, the government had managed a farm and pasture at the Tuba City Boarding School. *Masayesva*, 793 F.Supp. at 1509. Hopi and Navajo children attended the school, and the Hopi Tribe contended that Hopis had worked on the land. *Id.* The district court concluded that Hopis were not "located" on the boarding school land for purposes of obtaining rights to property. *Id.* This is a legal rather than "strictly factual" question, so we review *de novo, McConney*, 728 F.2d at 1202–04, and affirm.

Navajo interests are the residue of all the land in the 1934 reservation except for the "pockets" of land on which the Hopis were located in 1934. *Sekaquaptewa*, 619 F.2d at 808. Attending or working at a boarding school is not the kind of settlement which Congress meant to protect in the statute. One does not obtain a property interest in land where one attends school or works as an employee, no matter how long one is there in these capacities.

### E. Bennett Freeze.

 Congress provided in 1974, with immaterial exceptions, that no "lands in litigation" in the 1934 reservation should be developed except by written consent of each tribe:

> Any development of lands in litigation pursuant to [§ 640d–7] ... shall be carried out only upon the written consent of each

tribe, except for the limited area around the village of Moenkopi and around Tuba City.... "Development" as used herein shall mean any new construction or improvement to the property and further includes public work projects, power and water lines, public agency improvements, and associated rights-of-way.

25 U.S.C. § 640d–9(f). This statute codified the freeze imposed in 1966 by Commissioner of Indian Affairs Robert Bennett. It reduced the incentive for either tribe to develop the jointly occupied lands between the time when the freeze was imposed, and the time when the court would partition jointly held lands based on "fairness on equity." Otherwise, either tribe, anticipating that a judge would want to avoid allocating land occupied by members of one tribe to the other, would have an incentive to manipulate the expected partition by creating occupancy during the litigation period.

The district court believed that as of 1992, when he concluded his determinations required by our remand in 1980, that the residents "have waited long enough to see this litigation resolved," and maintenance of the statutory freeze would be "inequitable," so he ordered the freeze "lifted." *Masayesva*, 816 F.Supp. at 1417. He then granted a limited stay pending appeal of this order, for land in the partitioned joint use area. *Id.* at 1441.

The Hopis argue that the district court lacked authority to lift the statutory freeze. We review *de novo*, *Jeldness*, 30 F.3d at 1222, and reverse.

The district court had no authority to lift the freeze. Congress wrote law which prohibited development of "lands in litigation" without written consent of both tribes. The litigation was not concluded when the district court entered judgment. The Hopis had a right to appeal which they exercised. The purpose of the statute implies that it operates during appeal, because appeal carries the possibility of remand.

Congress expressly gave the district court discretion to partition jointly occupied land according to "fairness and equity." It did not confer comparable authority on the district court in the freeze provision.

The order lifting the freeze is vacated. The freeze remains in effect for the lands "in litigation." Those lands include, at the least, areas where the Hopis claim religious shrines and other religious occupancy. Whether other lands are "in litigation" depends on whether a petition for certiorari is filed, and whether it is granted.

### III. Conclusion.

This dispute probably has its origins in the sweep of the Athabascan people from the north, at about the same time the Spaniards entered the Hopi lands from the south. It can never be ended in a way which satisfies both tribes. The Hopis may feel that they have been robbed of their holy land, Hopitutskwa, by the use of Navajo force combined with American law. The Navajos may feel that they have been deprived of lands which to which they should be entitled because of their much greater population. Congress decided that the dispute should be brought to an end by litigation, and exercised its power to provide for the standards which should be used. That process has largely been completed, except for the determinations which must be made pursuant to this decision where the Hopis were located in 1934 for religious purposes.

AFFIRMED IN PART, REVERSED IN PART, and REMANDED.

### ORDER

Dec. 5, 1995.

The opinion filed on September 11, 1995, slip op. 11323, and appearing at 65 F.3d 1445 (9th Cir.1995), is ordered amended as follows:

Slip op. page 11339, first sentence of the first full paragraph; 65 F.3d at 1455, first sentence of second full paragraph, amend to read:

With this amendment, the panel has voted to deny the petition for rehearing. Judge Poole and Judge Kleinfeld vote to reject the suggestion for rehearing en banc. Judge Choy so recommends.

The full court has been advised of the suggestion for en banc rehearing, and no judge of the court has requested a vote on the suggestion for rehearing en banc. Fed. R.App.P. 35(b).

The petition for rehearing is denied, and the suggestion for a rehearing en banc is rejected.